**UNITED STATES of America**

v.

**MARYLAND STATE LICENSED BEV-
ERAGE ASSOCIATION, Inc., et al.**

**No. 23212.**

United States District Court
D. Maryland, Criminal Division.

Jan. 10, 1956.

George Cochran Doub, U. S. Atty., Baltimore, Md., Horace L. Flurry and Kenneth R. Lindsay, Sp. Assts. to the Atty. Gen., and Alan A. Dobey, Washington, D. C., Gordon B. Spivack, Silver Springs, Md., John F. Hughes, Washington, D. C., and Charles F. Rice, Attys. for Dept. of Justice, Arlington, Va., for plaintiff.

John Henry Lewin and David C. Green, Baltimore, Md., for Maryland Institute of Wine and Spirit Distributors, I. William Schimmel, R. W. L. Wine and Liquor Co., Inc. and Morris A. Kasoff.

Everett L. Buckmaster and Charles Mindel, Baltimore, Md., for Maryland State Licensed Beverage Ass'n, Inc., and John A. Menton.

William L. Marbury and John W. Hardwicke, Baltimore, Md., for National Distillers Products Corp., Robert E. Joyce, Jeffrey W. Clapp and B. C. Ohlandt.

Hilary W. Gans, Baltimore, Md., for Dant Distillery and Distributing Corp., Melrose Distillers Inc., CVA Corp., Schenley Distributors, Inc., Ralph T. Heymsfeld, Murrel J. Ades, Newton Kook and Max Sager.

Harold Ungar and F. Joseph Donohue, Washington, D. C., and John R. Fitzpatrick, Frederick, Md., for The

Kronheim Co., Inc., Milton S. Kronheim and Bernard Cohen.

Read A. McCaffrey, C. Gordon Haines and John Henry Lewin, Baltimore, Md., for McCarthy-Hicks Inc. and Edward S. Buckler, Jr.

Morris Rosenberg, Baltimore, Md., and Hugh B. Cox and James C. McKay, Washington, D. C., for Hiram Walker & Sons, Inc., Hiram Walker, Inc., Gooderham & Worts Ltd., James Barclay & Co. Ltd., Ross Corbit, Raymond Revit, F. A. Wilson and N. M. MacDonald.

A. Adgate Duer and Robert C. Prem, Baltimore, Md., for The Crosse and Blackwell Co. and John T. Menzies.

G. C. A. Anderson, Baltimore, Md., for Joseph E. Seagrams and Sons, Inc., and Frederick J. Lind.

William D. Macmillan, Baltimore, Md., for Distillers Distributing Corp., Harold S. Lee and John O. Brownell.

David R. Owen, Baltimore, Md., for John B. Turner and Ellis D. Slater.

Robert E. Coughlan, Jr., Baltimore, Md., for McKesson and Robbins, Inc., and J. D. Cotler.

George D. Hubbard, Baltimore, Md., for Walter F. Terry.

C. Clifton Virts, Frederick, Md., for Lawrence K. Franklin.

Zanvyl Krieger and John Henry Lewin, Baltimore, Md., for Churchill Ltd. and I. Strouse.

John Henry Lewin and Edwin Harlan, Baltimore, Md., for Gillett-Wright, Inc., and Harry W. Wright.

Ellis Levin and Louis Hoffman, Baltimore, Md., for Reliable Liquors, Inc. and Irving Smith.

Eugene M. Feinblatt and Gordon, Feinblatt & Rothman, Baltimore, Md., for Madera Bonded Wine and Liquor Co. and Harvey Steinbach.

Isaac Hecht, Baltimore, Md., for Maryland Package Liquor Stores Ass'n, Inc., and Jack Wulfert.

THOMSEN, Chief Judge.

The indictment in this case charges two associations of retailers, one association of wholesalers, fourteen manufacturers, seven wholesalers, and thirty-one individuals connected with them, engaged in the alcoholic beverage industry, with violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1, 2.

Count One charges a conspiracy "to raise, fix, maintain, and stabilize the wholesale and retail prices of alcoholic beverages shipped into the State of Maryland from manufacturers located outside the State of Maryland" in restraint of trade and commerce and in violation of Section 1. The terms of the conspiracy are alleged to have been: (a) that fair trade prices be required to be established, and that manufacturers and wholesalers be required to enforce the observance of said prices and sell only to retailers who comply; (b) that retailers be required, induced or compelled to observe and adhere to such fair trade prices; (c) that no alcoholic beverages be sold directly by a manufacturer to the Department of Liquor Control for Montgomery County or to the Liquor Control Boards of other monopoly counties, or be sold to said purchasers indirectly through a wholesaler at prices less than the wholesaler's resale prices; and (d) that manufacturers, wholesalers, and retailers boycott and refuse to deal with, and induce and compel others to boycott and refuse to deal with, those who do not establish, enforce, observe and adhere to those terms. Count Two charges a conspiracy to monopolize said trade and commerce, in violation of Section 2. The terms of this conspiracy are alleged to have been the same as those of the conspiracy alleged in Count One. Count Three charges an attempt to monopolize said trade and commerce, also in violation of Section 2.

The defendants have moved to dismiss Counts One and Two on the grounds: (1) that they are too vague, confusing and contradictory to charge any offense under the Sherman Act; (2) that the State of Maryland, following the Twenty-first Amendment, has by statute and court decisions preempted the whole field of marketing alcoholic beverages in

Maryland; that there is a conflict between the policy and terms of the Maryland law and the policy and terms of the Sherman Act; that the acts and conduct alleged to constitute the conspiracy in this case are permitted or at least not prohibited by the Maryland law, and implement the State policy; therefore they are not within the ambit of the Sherman Act, and any prosecution thereunder for such acts and conduct would be unconstitutional; and (3) that under the so-called "Rule of Reason" the alleged acts and conduct were justified by the circumstances, including all the applicable Federal and State laws and policies.[1]

The defendants have also moved to dismiss Count Two on the ground that it does not allege a conspiracy to monopolize violative of Section 2 of the Sherman Act, or, in the alternative, that the government be required to elect between Count One and Count Two, and to dismiss one or the other, on the ground that Count Two alleges no conspiracy different from the conspiracy alleged in Count One.

Certain individual defendants have filed separate motions to dismiss on the ground of vagueness, and separate motions to dismiss have been filed on behalf of three corporations which have been dissolved since the indictment.

Since the government has not yet supplied certain particulars of the offense charged in Count Three, the time for filing motions to dismiss that count has been extended.

### The Indictment
### Count One

I. The Defendants. Paragraphs 1 to 7 identify the defendants: twenty-four corporations, including two associations of retailers, one association of wholesalers, fourteen manufacturers, seven wholesalers, and thirty-one individuals connected with the corporations.

II. Definitions. Paragraph 8 defines "alcoholic beverages" to exclude beer, ale, porter and stout, and defines "manufacturer" as a person who operates a plant within the United States for distilling, rectifying, blending, fermenting, or bottling any alcoholic beverage, or imports into the United States any alcoholic beverage from outside the United States, or is a distributor of alcoholic beverages selling to a wholesaler for resale to a retailer.

III. Nature of Trade and Commerce Involved. Paragraph 9 alleges that alcoholic beverages are marketed in the State of Maryland in a continuous flow of shipments from manufacturers located outside the State, through wholesalers and retailers, to the consuming public; that under the laws of the State, alcoholic beverages shipped and sold by manufacturers are sold through the Department of Liquor Control for Montgomery County, and Liquor Control Boards in other monopoly counties, and wholesalers licensed as such under the laws of Maryland to county dispensaries and other retailers.

Paragraph 10 makes the following allegations: Alcoholic beverages shipped and sold by manufacturers are customarily sold in Montgomery County to the Department, in conformity with the laws of the State. The Department sells alcoholic beverages through county liquor dispensaries to the consuming public. The Department of Liquor Control for Montgomery County, under the laws of the State of Maryland, has customarily purchased as a wholesaler alcoholic beverages direct from manufacturers. In the counties of Caroline, Dorchester, Harford, Kent, Somerset, Worcester, and Wicomico, in the State of Maryland, al-

---

1. The Miller-Tydings Act, 15 U.S.C.A. § 1; the McGuire Act, 15 U.S.C.A. § 45; the Robinson-Patman Act, 15 U.S.C.A. § 13(a); the Maryland Fair Trade Act, Annotated Code of Maryland, 1951 Ed., Art. 83, §§ 102–110; the Maryland Unfair Sales Act, Annotated Code of Maryland, 1951 Ed., Art. 83, §§ 111–115; the Maryland Alcoholic Beverage Act, Annotated Code of Maryland, 1951 Ed., Art. 2B; the Sherman Act, 15 U.S.C.A. § 1; the Clayton Act, 15 U.S.C.A. § 12 et seq.; and the Federal Trade Commission Act, 15 U.S.C.A. § 41 et seq.

coholic beverages are sold, under the laws of the State, through county liquor dispensaries. Said counties, however, have customarily purchased alcoholic beverages from wholesalers licensed as such under the laws of Maryland, and said counties have not customarily operated as wholesalers. Said counties, including Montgomery County, are monopoly counties. In all other counties in the State of Maryland in which alcoholic beverages are sold, such alcoholic beverages are shipped and sold by manufacturers to licensed wholesalers, who in turn sell to retailers licensed as such who sell to the consuming public. Said counties are open counties.

Paragraphs 11 and 12 allege that in 1954, 90% of the 6,235,971 wine gallons of alcoholic beverages sold by retailers in Maryland was produced outside the State; that about 5% of the total was sold through county dispensaries, mostly in Montgomery County; and that there were 32 wholesalers and 8,783 retailers in Maryland, apart from boards and dispensaries in monopoly counties.

*IV. The Conspiracy.* Paragraph 13 alleges that beginning about January, 1950, and continuously thereafter up to the date of the indictment, the defendants and other persons to the Grand Jurors unknown, "knowingly have entered into and engaged in an unlawful combination and conspiracy to raise, fix, maintain, and stabilize the wholesale and retail prices of alcoholic beverages shipped into the State of Maryland from manufacturers located outside the State of Maryland," in restraint of the aforesaid trade and commerce, and in violation of Section 1 of the Sherman Act.

Paragraph 14 alleges: "The aforesaid combination and conspiracy has consisted of a continuing agreement and concert of action among the defendants and others to the Grand Jurors unknown, the substantial terms of which have been and are:

"(a) That so-called 'fair-trade' prices for alcoholic beverages be required to be established, and that manufacturers and wholesalers be required to enforce the observance of said prices and sell alcoholic beverages only to those retailers who observe and adhere to said prices;

"(b) That retailers be required to observe and adhere to, or be induced and compelled to observe and adhere to, 'fair-trade' prices on alcoholic beverages established as aforesaid;

"(c) That no alcoholic beverages sold in the State of Maryland be sold directly by a manufacturer to the Department of Liquor Control for Montgomery County or the Liquor Control Boards of other monopoly counties, or be sold to said purchasers indirectly through a wholesaler at prices less than his customary resale prices; and

"(d) That manufacturers, wholesalers, and retailers shall boycott and refuse to deal with, those who do not establish, enforce, observe and adhere to the terms set out in subparagraphs (a), (b) and (c) above."

Paragraph 15 alleges: "For the purpose of effectuating and carrying out the offense hereinabove described, the defendants, by agreement, understanding and concert of action, have done the things which, as hereinbefore alleged, they conspired and agreed to do."

*V. Effects.* Paragraph 16 alleges that the effects of the offense have been: (a) To raise, fix, maintain and stabilize the wholesale and retail prices of alcoholic beverages shipped in interstate commerce into the State of Maryland and sold and distributed therein; (b) To eliminate price competition among the defendant wholesalers and among retailers in the sale and distribution of alcoholic beverages shipped in interstate commerce into the State of Maryland; (c) To eliminate price competition among defendant wholesalers and the other members of defendant wholesalers' association, and among members of defendant retailers' associations in the sale and distribution of alcoholic beverages shipped in interstate commerce

into the State of Maryland;[2] (d) To eliminate direct sales of alcoholic beverages by manufacturers to monopoly counties acting as wholesalers; (e) To raise the wholesale and retail prices of alcoholic beverages in Montgomery County; (f) To require all interstate trade and commerce in alcoholic beverages to be channeled in the State of Maryland only through wholesalers; and (g) To restrain and suppress interstate trade and commerce in alcoholic beverages not covered by fair trade contracts.

Paragraph 17 alleges: "It has never been and is not now the purpose, intent, or effect of said offense to promote the purpose of the Miller-Tydings Act amendment to the Sherman Act (Act of Congress, August 17, 1937; 50 Stat. 693) as amended, or the McGuire Act (66 Stat. 631, July 14, 1952) or the Maryland Fair Trade Act, or to establish wholesale and retail prices on alcoholic beverages for the protection of the good will in the trade-marks, brands, or names of the manufacturers or wholesalers of such alcoholic beverages."

*VI. Jurisdiction and Venue.* Paragraph 18 alleges facts satisfying the requirements of jurisdiction and venue and of the applicable statute of limitations.

## Count Two

Count Two realleges all of the allegations of paragraphs 1 through 12 and 14 through 18 of Count One. In place of paragraph 13 of Count One, it alleges that beginning about January, 1950, and continuously thereafter, the defendants, together with others to the Grand Jurors unknown, "have entered into and engaged in an unlawful combination and conspiracy to monopolize the interstate trade and commerce in alcoholic beverages previously described herein in violation of Section 2 of the * * * Sherman Act."

## Count Three

Count Three is identical with Count Two except that it alleges "an attempt to monopolize the interstate trade and commerce in alcoholic beverages previously described herein in violation of Section 2 of the * * * Sherman Act," and that "in the aforesaid attempt to monopolize the defendants have done those things alleged in subparagraphs (a) through (d) of paragraph 14 of Count One."

## I.

### Definiteness of the Allegations.
### Rule 7.

The defendants have moved to dismiss Counts One and Two on the ground that said counts "are too vague, indefinite, confusing, uncertain in meaning and contradictory in their allegations to require defenses thereto, or to enable the defendants adequately to prepare defense thereto, or * * * to plead former conviction or acquittal or double jeopardy to said Indictment or to any later indictment or information which may be brought against them, and so vague, * * * that any trial or conviction of the defendants thereon would deny to them due process of law and

2. Paragraphs 83 to 86 of the Bill of Particulars state:

"83 & 84. In explanation, paragraphs 16(b) and 16(c) of the indictment, allege that the effects of the offense are and have been: under paragraph 16(b), to eliminate price competition between each defendant wholesaler and other defendant wholesalers, individually and as a group; and, under paragraph 16(c), to eliminate price competition between defendant wholesalers, individually and as a group, and other wholesalers, individually and as a group, who are members of MIWSD.

"85 & 86. In explanation, paragraphs 16(b) and 16(c) of the indictment allege that the effects of the offense are and have been: under paragraph 16(b), to eliminate price competition between retailers, including each and all retailers in Maryland without regard to membership in any association; and under paragraph 16(c), to eliminate price competition between each and all retailers who is or are a member or members of

contravene the Fifth Amendment to the Constitution of the United States."

 This contention is without merit. Rule 7(c), F.R.Crim.P., 18 U.S. C.A., requires that the indictment "shall be a plain, concise and definite written statement of the essential facts constituting the offense charged". Under the Sherman Act the conspiracy is the offense; no overt acts are necessary to complete the crime. Nash v. U. S., 229 U.S. 373, 33 S.Ct. 780, 57 L.Ed. 1232. Each count alleges plainly, concisely and definitely the nature and the substantial terms of the conspiracy charged therein, facts indicating its existence within the statutory period of limitations, and facts sufficient to establish venue. Moreover, although not required to do so, each count alleges acts done for the purpose of effectuating and carrying out the offense, and the effects of the offense. Much additional information has been furnished by bills of particulars, and further information will be furnished before trial by supplemental bills of particulars. Counts One and Two meet the requirements of Rule 7.

## II.

### Conflict with State Law and Policy.

The defendants have moved to dismiss Counts One and Two "for the reasons (a) that the alleged acts and conduct of the defendants charged, or attempted to be charged, therein, and the purposes, objectives and effects thereof, were permitted, sanctioned and encouraged by the announced governmental policy and law of the State of Maryland and the statutes (including Maryland Code, Article 2B, §§ 104 and 105 [3] and Article 83, §§ 102–115 [4]) and court decisions of said State, which state policy and law regarding alcoholic beverages has (sic) preempted the field of policy and law relating thereto and to the marketing thereof and is (sic) paramount by reason of the Twenty-First Amendment to the Constitution of the United States;

(b) that hence said alleged acts and conduct of the defendants are not within the ambit of the Sherman Act or forbidden by its provisions; (c) that the offenses charged, or attempted to be charged, would promote and further the announced governmental policy and law of the State of Maryland, and the objectives thereof, and hence constituted activity protected from the reach of the Sherman Act; (d) that, if the Sherman Act should be construed to apply to, forbid and punish said alleged acts and conduct of the defendants, it would, to that extent, conflict with, burden and obstruct the said policy and law of the State of Maryland, and the objectives thereof, and would be unconstitutional and void to that extent as in contravention of the Twenty-First Amendment * * * ; and (e) that any trial or conviction of the defendants on said Counts would conflict with said policy, law, statutes and court decisions of the State of Maryland and the administration of said policy and laws, and would deny to the defendants their rights under the same and contravene the Twenty-First Amendment * * *."

The Twenty-First Amendment.

The Twenty-First Amendment, in pertinent part, provides as follows:

"Sec. 2. The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited."

In State Board of Equalization of California v. Young's Market Co., 299 U.S. 59, 62, 57 S.Ct. 77, 78, 81 L.Ed. 38, Mr. Justice Brandeis, construing the Amendment, said: " * * * The words used are apt to confer upon the state the power to forbid all importations which do not comply with the conditions which it prescribes * * *".

In Washington Brewers Institute v. United States, 9 Cir., 137 F.2d 964, 967,

---

**3.** Part of the Alcoholic Beverage Law.

**4.** The Maryland Fair Trade Act and the Maryland Unfair Sales Act.

968, the court held: "* * * While it (the Twenty-First Amendment) does not in terms transfer power to the states it does free them from a previous constitutional restraint. As a matter of fundamental national law, the Amendment prohibits the transportation or importation of intoxicants into any state or territory for delivery or use therein in violation of the laws thereof. Interstate commerce in liquor, not in violation of state laws, was left, as before, a matter of national concern."

In Carter v. Commonwealth of Virginia, 321 U.S. 131, 138, 64 S.Ct. 464, 469, 88 L.Ed. 605, Mr. Justice Black, in a concurring opinion, stated: "The Twenty-first Amendment has placed liquor in a category different from that of other articles of commerce. Though the precise amount of power it has left in Congress to regulate liquor under the Commerce Clause has not been marked out by decisions, this much is settled: local, not national, regulation of the liquor traffic is now the general Constitutional policy."

### The Maryland Statutes, Regulations and Decisions.

Following the Twenty-first Amendment, in 1933, the Maryland legislature adopted a comprehensive statute for control of the liquor traffic. This statute has been amended from time to time,

and now appears as Article 2B of the Annotated Code of Maryland.

In January, 1950, when the indictment alleges the conspiracy began, Art. 2B, § 94, now Section 104, was in force. It provides:

"In order to eliminate the undue stimulation of the sale of alcoholic beverages and the practice of manufacturers and wholesalers in granting secret discounts, rebates, allowances, free goods or other inducement to selected licensees which contribute to a disorderly distribution of alcoholic beverages, it shall be unlawful for any person licensed hereunder as a manufacturer or wholesaler to discriminate directly or indirectly in price, discounts or the quality of merchandise sold, between one dispensary and another dispensary, between one wholesaler and another wholesaler or between one retailer and another retailer purchasing alcoholic beverages bearing the same brand and trade name and of like age and quality. * * * The Comptroller may promulgate such rules and regulations as are necessary to carry out the purpose of this section."

The Comptroller had promulgated Regulation 206, which required the filing of schedules of prices and proposed price changes.[5] The Court of Appeals of

---

5. The following summary of the relevant portions of Regulation 206 is taken from the first Dundalk case, 197 Md. at pages 450, 451, 79 A.2d at page 527:

"Prices may be reduced in the following manner: Notice thereof must be filed with the Comptroller by registered mail not later than the 5th day of the current month, to become effective the 1st day of the subsequent month. Upon receipt of such a notice, the Comptroller then sends notices to all licensees selling to county dispensaries or retail dealers not later than the 12th day of the current month, advising them of the proposed decrease. The licensees receiving such a notice from the Comptroller have the right to reduce the price of one or more competitive items of the same kind or character in a like amount by notifying the Comptroller by registered mail not later than the 20th day

of the current month, and upon receiving a written acknowledgment from the Comptroller. The price reduction initiated by a licensee and price reductions on competing items all become effective on the 1st day of the month subsequent to that in which the original action to reduce a price is undertaken. Regulation 206 recognizes that in certain extraordinary circumstances, a price reduction must be accomplished on less than the notice required as set forth above. Accordingly," it makes provision for those special situations.

Official instruction No. 17, published in connection with said regulation, read as follows: "A new item cannot be established at a lower price than the current base price filed by other manufacturers and wholesalers with respect to the same size of a similar case, formula or character of item."

Maryland, in Dundalk Liquor Co. v. Tawes, 197 Md. 446, 79 A.2d 525, decided March 16, 1951, "held that the Comptroller's regulations were not authorized by section 104 of Article 2B of the Code of 1951 for the reason, *inter alia*, that they tended to permit horizontal price fixing, which section 104 does not authorize."[6]

The legislature promptly adopted two new acts, Chapter 566 and Chapter 711 of the Acts of 1951. Two sections from these acts are now codified as Article 2B, §§ 1 and 105, respectively, of the Maryland Code. They are:

"1. It is hereby declared as the policy of the State that it is necessary to regulate and control the manufacture, sale, distribution, transportation and storage of alcoholic beverages within this State and the transportation and distribution of alcoholic beverages into and out of this State to obtain respect and obedience to law and to foster and promote temperance. * * The restrictions, regulations, provisions and penalties contained in this Article are for the protection, health, welfare and safety of the people of this State. It shall also be the policy of the State to tax alcoholic beverages as provided in this Article."

"105. (a) It is the declared policy of this State that it is necessary to regulate and control the sale and distribution within the State of wines and liquors, for the purpose of fostering and promoting temperance in their consumption and respect for and obedience to the law. In order to eliminate price wars, which unduly stimulate the sale and consumption of wines and liquors and disrupt the orderly sale and distribution thereof, it is hereby declared as the policy of this State that the sale of wines and liquors should be subjected to the following restrictions, prohibitions and regulations. The necessity for the enactment of the provisions of this section is, therefore, declared as a matter of legislative determination."

(b) This subsection authorizes and directs the Comptroller to fix maximum discounts, or prohibit discounts, to be allowed by manufacturers or wholesalers of wines and liquors in the sale or distribution thereof.[7]

(c) This subsection authorizes and directs the Comptroller to require the filing of schedules of prices and proposed price changes at which wines and liquors are sold by such manufacturers or wholesalers and by non-resident dealers.[8]

---

6. This quotation is taken from the second Dundalk case, 201 Md. 58 at page 64, 92 A.2d 560 at page 562.

7. Section 105(b) reads as follows: "The Comptroller is authorized and directed, by regulation, to prescribe the maximum discounts which may be allowed by any manufacturer or wholesaler in the sale and distribution of various quantities of wines and liquors. Said regulation may also, in the discretion of the Comptroller, prohibit the giving of discounts by any manufacturer or wholesaler in the sale and distribution of any or all quantities or kinds of wines and liquors."

8. Section 105(c) reads as follows: "The Comptroller is authorized and directed, by regulation, to require the filing, from time to time, by any manufacturer or wholesaler or non-resident dealer, of schedules of prices at which wines and liquors are sold by such manufacturer or wholesaler or non-resident dealer, and further to require the filing of any proposed price change. Said regulation shall provide that the effective date of any proposed price decrease shall be postponed for such period of time as the Comptroller may prescribe sufficient to permit notice thereof to other manufacturers or wholesalers selling similar wines and liquors and an opportunity for the same to make a like price decrease. Said regulation shall also provide that any manufacturer or wholesaler or non-resident dealer proposing to sell any wines and liquors not currently being sold by the same shall first give notice to the Comptroller of the prices at which

(d) This subsection provides penalties.

(e) This subsection provides that nothing in Section 105 shall be construed to authorize the Comptroller to fix prices other than to fix discounts and to postpone the effective date of any proposed price decrease or of the sale of a new product, as provided in subsections (b) and (c).[9]

Pursuant to Ch. 711, now section 105, the Comptroller adopted Regulation 207 on November 1, 1951, amended it on September 30, 1952, and revised it on June 1, 1955, after the indictment in this case. The original regulation, as amended in 1952, applied to and set up the following classes of Licensees and Permittees: " 'A'—Manufacturers or wholesalers; 'B'—County Dispensaries without Monopoly State Agreement; 'C' —Retailers; 'D'—Non-resident Dealers." Various sections dealt with filing, discounts, master schedules, establishing items before sale, etc., as authorized by the 1951 law. No effort was made to deal with the problem created by the fact that the Department of Liquor Control for Montgomery County was acting as both a wholesaler and a retailer, buying from manufacturers at the price at which they sold wholesalers, selling as a wholesaler to clubs, etc., in Montgomery County, and selling as a retailer in its dispensaries, at whatever prices it chose. On June 1, 1955, after the indictment in this case, the Comptroller revised Regulation 207, dividing Licensees and Permittees into the following classes: " 'A' —Wholesalers who supply Retailers; 'B' —Retailers; 'C'—Manufacturers, Wholesalers and Non-Resident Dealers who Supply Wholesalers." The question whether Montgomery County should be considered a wholesaler or a retailer is not solved by the revision. See Article 2B, §§ 2(h), 2(i), 2(j), 153, 154(b), 154 (k) and 157(b) (2) of the Maryland Code.

Chapter 711 of the Acts of 1951, now Section 105, was challenged in Dundalk Liquor Co. v. Tawes, 201 Md. 58, 92 A. 2d 560, 562. The Court of Appeals of Maryland, in an opinion by Chief Judge Markell, discussed the legal history of the economic problems involved, noted that although the Court had decided in

---

such wines and liquors are proposed to be sold; and said regulation shall further provide that sales of such wines and liquors shall not be made for such period of time as the Comptroller may prescribe sufficient to permit notice thereof to other manufacturers or wholesalers selling similar wines and liquors and an opportunity for such other manufacturers or wholesalers to alter the price of such similar wines and liquors so as to make that price comparable to the price fixed by the manufacturer or wholesaler proposing to sell wines and liquors not currently being sold. The Comptroller is authorized and empowered, in promulgating the regulations required by this subsection, to require the filing by any manufacturer or wholesaler or non-resident dealer of any other information with regard to the size, containers, brands, labels, descriptions, packages, quantities to be sold and any other data in connection with wines and liquors as the Comptroller may reasonably determine."

9. Section 105(e) reads as follows: "Nothing contained in this section shall be construed to authorize the Comptroller to fix the prices at which any wines and liquors may be sold by any manufacturer or wholesaler or non-resident dealer other than to fix permissible discounts which may be allowed by any manufacturer or wholesaler on such sales and other than to postpone the effective date of any proposed price decrease in the sale and distribution of wines and liquors currently sold by any manufacturer or wholesaler or non-resident dealer or the effective date of the sale of any wines and liquors not currently being sold by any manufacturer or wholesaler or non-resident dealer for a reasonable period sufficient to permit the filing of proposed price decreases or proposed sales of wines and liquors not currently being sold, as the case may be, with the Comptroller and notice thereof to other manufacturers or wholesalers, and an opportunity for the same to make like price changes. Nothing contained in this section shall be construed to require any manufacturer or wholesaler or non-resident dealer of wines and liquors to make sales to any licensees under the provisions of this Article."

the first Dundalk case that the earlier regulations were not authorized by Section 104 "for the reason, inter alia, that they tended to permit horizontal price fixing, which section 104 does not authorize", the legislature by the Act of 1951 expressly authorized such regulations. Judge Markell continued, 201 Md. at page 66, 92 A.2d at page 563:

"Plenary state control over intoxicating liquor, unrestricted by the Commerce Clause, art. 1, § 8, cl. 3, is based on two grounds, (1) the Twenty-first Amendment, and (2) recent Supreme Court decisions which have expanded the scope, both in liquor cases and in other cases, of the old rule that the Commerce Clause, when Congress has not acted, does not prohibit local regulations of interstate commerce which primarily protect local interests, e. g., pilotage laws, and only incidentally affect interstate commerce. With respect to intoxicating liquors the court has sometimes divided as to which of these two grounds is applicable, but the result is always the same. State of California v. Thompson, 313 U.S. 109, 61 S.Ct. 930, 85 L.Ed. 1219; Duckworth v. State of Arkansas, 314 U. S. 390, 62 S.Ct. 311, 86 L.Ed. 294; Carter v. Commonwealth of Virginia, 321 U.S. 131, 137, 64 S.Ct. 464, 88 L.Ed. 605. * * * Both before the Eighteenth, and since the Twenty-first Amendment these questions 'must be judged in the light of our longstanding recognition of the exceptional problems involved in successfully regulating trade in intoxicating liquors.' Carter v. Commonwealth of Virginia, supra, 321 U.S. 136–137, 64 S.Ct. 468."

Judge Markell quoted the Twenty-first Amendment, State Board of Equalization of California v. Young's Market Co., supra, and the following passage from the concurring opinion of Mr. Justice Frankfurter in U. S. v. Frankfort Distilleries, 324 U.S. 293, 300–301, 65 S. Ct. 661, 89 L.Ed. 951:

" 'As a matter of constitutional law, the result of the Twenty-first Amendment is that a State may erect any barrier it pleases to the entry of intoxicating liquors. Its barrier may be low, high, or insurmountable. Of course, if a State chooses not to exercise the power given it by the Twenty-first Amendment and to continue to treat intoxicating liquors like other articles, the operation of the Commerce Clause continues. Since the Commerce Clause is subordinate to the exercise of state power under the Twenty-first Amendment, the Sherman Law, deriving its authority from the Commerce Clause, can have no greater potency than the Commerce Clause itself. It must equally yield to state power drawn from the Twenty-first Amendment. And so, the validity of a charge under the Sherman Law relating to intoxicating liquors depends upon the utilization by a State of its constitutional power under the Twenty-first Amendment. If a State for its own sufficient reasons deems it a desirable policy to standardize the price of liquor within its borders either by a direct price-fixing statute or by permissive sanction of such price-fixing in order to discourage the temptations of cheap liquor due to cutthroat competition, the Twenty-first Amendment gives it that power and the Commerce Clause does not gainsay it. Such state policy can not offend the Sherman Law even though distillers or middlemen agree with local dealers to respect this policy. If an agreement among local dealers not to buy liquor through channels of interstate commerce does not offend the Sherman Law though a like agreement as to other commodities would, an agreement among liquor dealers to abide by state policy for a uniform price —which is far less restrictive of interstate commerce than a comprehensive boycott—can hardly be a

violation of the Sherman Law.' 324 U.S. at pages 300–301, 65 S.Ct. at page 665."

Judge Markell stated in 201 Md. at page 68, 92 A.2d at page 564:

"We assume, without deciding, that the requirements of schedules of price changes and notice to competitors tend to restrict competition and maintain prices and that such conduct by individuals, under no compulsion by law, would violate the Sherman Act. But the filing of price schedules and notice to competitors is not the act of individuals but is done under compulsion of state law with state officials. The fact that to the proponents of the law this may be pleasing compulsion does not change the nature of the conduct. The Sherman Act does not 'restrain state action or official action directed by a state.' Parker v. Brown, 317 U.S. 341, 351, 63 S. Ct. 307, 313, 87 L.Ed. 315. If the act of 1951 did operate directly on dealers without the intervention of state agencies, it would still be within state power under the Twenty-first Amendment."

The Frankfort Distilleries and the Washington Brewers Cases.

Questions similar to those raised by the motions in the case at bar were presented in U. S. v. Frankfort Distilleries, Inc., 324 U.S. 293, 65 S.Ct. 661, 89 L.Ed. 951, and in Washington Brewers Institute v. U. S., 9 Cir., 137 F.2d 964. A portion of the concurring opinion of Mr. Justice Frankfurter in the Frankfort Distilleries case, quoted by Judge Markell in the second Dundalk case, has been set out above. The opinion of the Court was written by Mr. Justice Black. The majority opinion referred to the Colorado Fair Trade Act, 1937 Colo. Session Laws, Ch. 146 [10], and said:

"But the Miller-Tydings Amendment to the Sherman Act does not permit combinations of businessmen to coerce others into making such contracts, and Colorado has not attempted to grant such permission. Both the federal and state 'Fair Trade' Acts expressly provide that they shall not apply to price maintenance contracts among producers, wholesalers and competitors. It follows that whatever may be the rights of an individual producer under the Miller-Tydings Amendment to make price maintenance contracts or to refuse to sell his goods to those who will not make such contracts, a combination to compel price maintenance in commerce among the states violates the Sherman Act. United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 719–723, 64 S.Ct. 805, 811–813 [88 L.Ed. 1024]; United States v. Univis Lens Co., 316 U.S. 241, 252–253, 62 S.Ct. 1088, 1094, 86 L.Ed. 1408. Consequently, respondents were properly convicted, unless as they argue, their conduct is not covered by the Sherman Act, either because the price fixing applied only to retail sales which were wholly intrastate, or because the state's power to control the liquor traffic within its boundaries makes the Sherman

10. Section 17 of the Colorado Liquor Code, as amended by chapter 160, Laws of 1941, makes it unlawful wilfully and knowingly to advertise, offer for sale, or sell vinous liquors, spirituous liquors and alcoholic beverages at less than the price stipulated in any contract entered into pursuant to the provisions of the Fair Trade Act; section 29 provides for a manufacturer's license, a wholesaler's license, and a retail liquor store license; and section 20, as amended by Laws 1941, c. 159, authorizes the licensing authority, created by the preceding section, to make rules and regulations pursuant to the licensing provisions.

"The Colorado Unfair Practices Act, 1941 Colo.Session Laws, Ch. 227, amending and reenacting 1937, Session Laws, Ch. 261, makes it unlawful to sell goods below cost to injure or destroy competition, and states that the express purpose of the Act is 'to safeguard the public against * * * monopolies and to foster and encourage competition'." 324 U.S. at page 299, note 6, 65 S.Ct. at page 665.

Act inapplicable." 324 U.S. at pages 296, 297, 65 S.Ct. at page 663.

The first of these possible arguments is not raised in the case at bar. With respect to the second, the Supreme Court said:

"It is argued that the Twenty-first Amendment to the Constitution bars this prosecution. That Amendment bestowed upon the states broad regulatory power over the liquor traffic within their territories. It has not given the states plenary and exclusive power to regulate the conduct of persons doing an interstate liquor business outside their boundaries. Granting the state's full authority to determine the conditions upon which liquor can come into its territory and what will be done with it after it gets there, it does not follow from that fact that the United States is wholly without power to regulate the conduct of those who engage in interstate trade outside the jurisdiction of the State of Colorado.

"The Sherman Act is not being enforced in this case in such manner as to conflict with the law of Colorado. Those combinations which the Sherman Act makes illegal as to producers, wholesalers and retailers are expressly exempted from the scope of the Fair Trade Act of Colorado, and thus have no legal sanction under state law either. We therefore do not have here a case in which the Sherman Act is applied to defeat the policy of the state. That would raise questions of moment which need not be decided until they are presented. * * *"

Mr. Justice Frankfurter, in his concurring opinion, after the statement quoted by Judge Markell, said:

"Thus the question in this case, as I see it, is whether in fact the policy of Colorado sanctions such an arrangement as the indictment charges. Such a policy may be expressed either formally by legislation or by implied permission. Unless state policy is voiced either by legislation or by state court decisions, it is precarious business for an outsider to be confident about the legal policy of a State. So far as our attention has been called to materials relevant for ascertaining the policy of Colorado toward such a price arrangement as is here charged, it would be temerarious to suggest that Colorado does sanction it. Indeed, the legislation of Colorado looks in the opposite direction. And we have no guidance from state decisions to suggest that the apparent condemnation of such an arrangement under the Colorado Fair-Trade Act, § 2, Colo.Stat.Ann., ch. 165, § 20(2), does not condemn the price arrangements before us. Although the Attorney General of Colorado has filed a brief as *amicus curiae* on the side of the respondents, his argument is not based on the contention that the policy of Colorado sanctions that which it is claimed the Sherman Law forbids. In the view I take of the matter, if a State authorized the transactions here complained of, the Sherman Law could not override such exercise of state power. For, in any event, if state policy did so authorize it, conformity with the state policy could not be deemed an 'unreasonable' restraint of interstate commerce. But I do not find that Colorado has done so."

In Washington Brewers Institute v. U. S., supra, the Ninth Circuit said:

"The Sherman Act was enacted under authority of the commerce clause and is necessarily of no greater dignity than that clause. The evils at which it is aimed differ from the abuses attempted to be corrected by the state laws here in question. The one seeks to stamp out private monopoly and to interdict combinations in restraint of trade, the others to correct abuses inherent in the liquor traffic. But

modern legislation having the latter purpose tends toward the abolition of many competitive practices found by experience to be productive of evils. Thus the broad theory of the Sherman Act—that trade should be free of artificial restraints—is in many respects incompatible with the policy of state liquor-control legislation; and wherever such conflicts exist the Sherman Act must give way, just as the commerce clause itself gives way in identical circumstances. Where invocation of that Act tends to hamper or interfere with the enforcement of state laws regulatory of the transportation or importation of intoxicants, the Act is unenforceable. By the terms of its own fundamental law the national government has disabled itself from prosecuting as an offense that which a state has commanded or implicitly encouraged as a means of controlling the traffic in intoxicants within its borders.

"But we should be slow to assume that these states have undertaken to sanction combinations among producers having as their purpose the fixing of uniform and artificial beer prices, and appellants do not affirm that. Indeed, as certain of appellants themselves point out, the states have laws forbidding restraints of trade or the fixing or maintaining of artificial and noncompetitive prices for commodities generally, which laws are applicable to beer as well as to other commodities. The state laws regulatory of the traffic in malt liquors are directed toward individual conduct. Obedience to them is not rendered difficult or impracticable by the enforcement of a federal statute declaring price-fixing combinations unlawful. In arriving at prices to be charged for their commodity brewers are not required by the states to act otherwise than as free agents, nor are they expected to

confederate together with the design of suppressing legitimate competition in respect either of quality or of price. * * *" 137 F.2d at pages 967, 968.

### Discussion of Points.

A. (1) Defendants contend that Maryland has adopted a policy of stabilizing prices and eliminating competition in the marketing of alcoholic beverages. Their first argument is that the acts charged in Count One and Count Two are sanctioned by State law, those in sub-paragraphs 14a, 14b and 14d impliedly, and those in sub-paragraph 14c expressly; that the conduct charged actually implements the Maryland policy, and is therefore beyond the reach of the Sherman Act.

 The decision in the Washington Brewers case, set out in the preceding paragraph, answers this argument so far as 14a, 14b and 14d are concerned. The Maryland statute is directed toward individual conduct. Obedience to it is not rendered difficult or impracticable by the enforcement of the federal statute declaring price-fixing combinations and conspiracies to monopolize unlawful. Under the Maryland Fair Trade Law the fair trading of a product is optional with the manufacturer. Section 105(e) makes it clear that the Comptroller is not given authority to fix prices, but only to do the things expressly authorized by section 105(b) and (c). Nothing in that section or in any other provision of the Maryland law makes fair trading mandatory or authorizes a private combination to fix prices.

The allegations with respect to Montgomery County and other monopoly counties in 14c present greater difficulty, because the statute permits the boards in those counties to act as both wholesalers and retailers, and this is bound to cause difficulty with retailers in adjacent open counties. The proper interpretation of the statutes is not clear, as witness the Comptroller's June 1, 1955, revision of Regulation 207. The difficulty of the position in which manu-

facturers and wholesalers were placed is obvious. It may be that if the only conduct which would violate the Sherman Act proved at the trial of this case was in connection with sales to Montgomery County and other monopoly counties, the court should then dismiss one or both of the counts. But at the present time each count charges a combination or conspiracy the terms of which go beyond what may reasonably be considered implementation of the statutes or policy of the State of Maryland.

■ (2) The motion of the Maryland State Licensed Beverage Association to take testimony at this time under Rule 12 to show that Montgomery County was getting preferential treatment from manufacturers, must be denied. This motion raises questions which should be deferred until the trial of the general issue. To attempt to dispose of them at this time would require a double trial of a large part of the case.

(B) Defendants' second argument is directed primarily at Count One, which charges a conspiracy to fix prices, but is extended to Count Two on the theory that the conspiracy to monopolize deals only with the prices at which Montgomery County is forced to buy. The argument runs as follows: (1) under the Twenty-first Amendment the States have powers in the regulation of the liquor traffic which are paramount to the Commerce Clause, U.S.C.A.Const. art. 1, § 8, cl. 3, and to statutes enacted pursuant thereto, including the Sherman Act; (2) once a State Legislature has exercised its powers under that Amendment to regulate the liquor traffic, all federal legislation is superseded which conflicts with the policy of the State legislation; (3) Maryland has preempted the field relating to the regulation of prices at which intoxicating beverages may be sold, and the policy and specific provisions of the Maryland statute are in conflict with the Sherman Act.

■ There is force in this argument. The first proposition is supported by State Board of Equalization v. Young's Market Co., 299 U.S. 59, 57 S.Ct. 77, 81

L.Ed. 38; Carter v. Commonwealth of Virginia, 321 U.S. 131, 64 S.Ct. 464, 88 L.Ed. 605; Washington Brewers Institute v. U. S., 9 Cir., 137 F.2d 964; Dundalk Liquor Co. v. Tawes, 201 Md. 58, 92 A.2d 560, quoted above, although it was left open by the majority of the Court in Frankfort Distilleries v. U. S., 324 U.S. 293, 65 S.Ct. 661, 89 L.Ed. 564. I do not suggest that the Federal Government has no power to legislate in the field of intoxicating beverages, nor that legislation by the State may supersede contrary Federal legislation under the taxing powers of Congress or under the war powers. See Arrow Distilleries v. Alexander, 7 Cir., 109 F.2d 397; Jatros v. Bowles, 6 Cir., 143 F.2d 453; Brown v. Jatros, D.C.E.D.Mich., 55 F.Supp. 542. But I do hold that valid legislation by a State under the Twenty-first Amendment is paramount to conflicting Federal legislation under the Commerce Clause.

What tests shall be applied in determining the boundaries of the field or the portions of the field that the State has preempted, and in determining whether there is such conflict between State law or policy on the one hand and the Federal statute on the other that enforcement of the Federal statute must be denied?

Defendants contend that we should apply in reverse, so to speak, the familiar rule that where the Federal Government has paramount power it may by legislation preempt the field so as to preclude the valid exercise of State legislative authority. See, for example, Bethlehem Steel Co. v. New York State Labor Relations Board, 330 U.S. 767, 67 S.Ct. 1026, 91 L.Ed. 1234; United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440; Union Brokerage Co. v. Jensen, 322 U.S. 202, 64 S.Ct. 967, 88 L.Ed. 1227; Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447; Pennsylvania Water & Power Co. v. Federal Power Commission, 89 U.S. App.D.C. 235, 193 F.2d 230, affirmed 343 U.S. 414, 72 S.Ct. 843, 96 L.Ed. 1042.

In the Bethlehem Steel case [330 U.S. 767, 67 S.Ct. 1030], Mr. Justice Jackson,

speaking for the Court said: "* * * But when federal administration has made comprehensive regulations effectively governing the subject matter of the statute, the Court has said that a state regulation in the field of the statute is invalid even though that particular phase of the subject has not been taken up by the federal agency. * * *" In United States v. South-Eastern Underwriters Ass'n [322 U.S. 533, 64 S. Ct. 1171], the primary test was stated to be "not the mechanical one of whether the particular activity affected by the state regulation is part of interstate commerce, but rather whether, in each case, the competing demands of the state and national interests involved can be accommodated." In Union Brokerage Co. v. Jensen [322 U.S. 202, 64 S. Ct. 971], Mr. Justice Frankfurter said that the test of conflict is whether the respective statutes can "move freely within the orbits of their respective purposes without impinging upon one another;" and in the Rice case [331 U.S. 218, 67 S.Ct. 1155], the Court, speaking through Mr. Justice Douglas, said: "* * The test, therefore, is whether the matter on which the State asserts the right to act is in any way regulated by the Federal Act. If it is, the federal scheme prevails though it is a more modest, less pervasive regulatory plan than that of the State." See also Cloverleaf Butter Co. v. Patterson, 315 U.S. 148, 786, 62 S.Ct. 491, 86 L.Ed. 754; Charleston & W. C. R. Co. v. Varnville Furniture Co., 237 U.S. 597, 35 S.Ct. 715, 59 L.Ed. 1137; Hill v. State of Florida, 325 U.S. 538, 65 S.Ct. 1373, 89 L.Ed. 1782.

Whether that broad rule should be applied in reverse has never been determined by the Supreme Court. Arguments both ways suggest themselves. A district judge would be well advised to proceed cautiously, especially in view of the decisions of the Supreme Court and the Ninth Circuit respectively in the Frankfort Distilleries and Washington Brewers cases. Those courts permitted enforcement of the Sherman Act in cases involving conspiracies to fix prices where the court found that there was not conflict between the State law and policy and the Sherman Act with respect to the offense charged. It is true that the laws of Maryland are not the same as the laws of the States involved in those cases. Maryland has stated a general policy against price wars in the liquor business, and has implemented this policy by certain specific requirements, namely, an anti-price discrimination policy provision, a provision for the fixing of maximum discounts by the Comptroller, and a provision requiring the posting of prices by manufacturers and wholesalers, but not by retailers. These provisions "tended to permit horizontal price fixing," 201 Md. at page 64, 92 A. 2d at page 562, and some suppression of competition. But neither the provisions of Article 2B of the Maryland Code nor the decisions of the Court of Appeals of Maryland indicate that the State has adopted a policy which sanctions combinations or conspiracies to raise and fix prices or to monopolize any part of the interstate traffic in alcoholic beverages.

█ The Maryland law and the Sherman Act come into direct conflict at certain points. The Maryland statute requires that schedules of price changes be filed and that notice thereof be given to competitors. Such action apart from the State statute would be forbidden by the Sherman Act. Federal Trade Commission v. Pacific States Paper Trade Ass'n, 273 U.S. 52, 62, 47 S.Ct. 255, 71 L.Ed. 534; Eugene Dietzgen Co. v. Federal Trade Commission, 7 Cir., 142 F.2d 321, 329. If the indictment went no further than this, it could not stand. But it does go further, and charges conduct beyond anything reasonably within the ambit of the State policy.

█ Defendants argue that practices which the State has not expressly condoned or required are equally within its preempted exclusive jurisdiction as those practices it has expressly dealt with; and that if practices are engaged in which promote the announced State policy and objectives too strenuously, they can be curtailed or punished only

by Maryland law. This may be true if the practices engaged in reasonably implement the policy of the State. But if the practices go beyond such implementation and violate the Sherman Act, the guilty parties may be punished under the Federal law. United States v. Frankfort Distilleries, Inc., 324 U.S. 293, 65 S.Ct. 661, 89 L.Ed. 951; Washington Brewers Institute v. United States, 9 Cir., 137 F.2d 964.

 Whether the government will be able to prove to the satisfaction of a jury that the alleged conspiracy was entered into for the purposes charged is another matter. It is noteworthy that the indictment states in Paragraph 17: "It never has been and is not now the purpose, intent, or effect of said offense to promote the purpose of the Miller-Tydings Act amendment to the Sherman Act, (Act of Congress, August 17, 1937; 50 Stat. 693) as amended, or the McGuire Act (66 Stat. 631, July 14, 1952) or the Maryland Fair Trade Act, or to establish wholesale and retail prices on alcoholic beverages for the protection of the good will in the trade-marks, brands, or names of the manufacturers or wholesalers of such alcoholic beverages"; and that the indictment does *not* state that the purpose, intent or effect of the alleged conspiracy under either Count was not to promote the purpose of Article 2B of the Maryland Code. In reply to a demand for particulars, the government has stated with respect to both Count One and Count Two that it "has no evidence of a single express agreement among the defendants, which constituted the conspiracy" but that "the conspiracy was a continuous and constantly developing over-all plan composed and consisting of numerous and shifting acts, transactions, understandings and agreements of the defendants throughout its life, from which the conspiracy and entry into it by each defendant is implied". I rule that at the trial defendants will be entitled to contend and to introduce evidence tending to prove that the purpose, intent and effect of their acts, transactions, under-

standings, agreements or course of conduct were to promote the purpose of the relevant provisions of Article 2B of the Maryland Code. Rulings on the sufficiency of the evidence offered by the respective parties to prove their contentions will have to abide the event.

(C) Defendants' argument on this point is fortified by the "Rule of Reason", applied by the Supreme Court in Sugar Institute v. United States, 297 U.S. 553, 56 S.Ct. 629, 641, 80 L.Ed. 859, where the Court said:

"* * * The restrictions imposed by the Sherman Anti-Trust Act * * * are not mechanical or artificial. We have repeatedly said that they set up the essential standard of reasonableness. * * * They are aimed at contracts and combinations which 'by reason of intent or the inherent nature of the contemplated acts, prejudice the public interest by unduly restricting competition or unduly obstructing the course of trade.' * * * Designed to frustrate unreasonable restraints, they do not prevent the adoption of reasonable means to protect interstate commerce from destructive or injurious practices and to promote competition upon a sound basis. Voluntary action to end abuses and to foster fair competitive opportunities in the public interest may be more effective than legal processes. And co-operative endeavor may appropriately have wider objectives than merely the removal of evils which are infractions of positive law. Nor does the fact that the correction of abuses may tend to stabilize a business, or to produce fairer price levels, require that abuses should go uncorrected or that an effort to correct them should for that reason alone be stamped as an unreasonable restraint of trade. Accordingly we have held that a co-operative enterprise otherwise free from objection, which carries with it no monopolistic menace, is not to be con-

demned as an undue restraint merely because it may effect a change in market conditions where the change would be in mitigation of recognized evils and would not impair, but rather foster, fair competitive opportunities. Appalachian Coals v. United States, 288 U.S. 344, 373, 374, 53 S.Ct. 471, 77 L.Ed. 825 * * *."

See also Millinery Creators' Guild v. Federal Trade Commission, 2 Cir., 109 F.2d 175.

�█ (1) The courts have recognized that the Sherman Act has only limited applicability to regulated industries, such as public utilities. Pennsylvania Water & Power Co. v. Federal Power Commission, 89 U.S.App.D.C. 235, 193 F.2d 230, affirmed 343 U.S. 414, 72 S.Ct. 843, 96 L.Ed. 1042. Defendants seek to apply this rule by analogy to the liquor traffic. The analogy, however, should not be applied unless the State law goes further in controlling prices than the Maryland law involved in this case.

(2) Defendants argue that "any restraints and/or monopolization of trade and commerce in alcoholic beverages which are within the ambit of the Sherman Act and forbidden by its provisions must be factually unreasonable, within the Rule of Reason, in the light of the purposes, objectives, effects and all the surrounding circumstances thereof, including the policy and law of the State of Maryland * * * and relevant federal laws and statutes, including the Miller-Tydings Act (U.S.C. Title 15, Sec. 1), the McGuire Act (U.S.C. Title 15, Sec. 45), the Clayton Act as amended by the Robinson-Patman Act (U.S.C. Title 15, Sec. 13(a)) and the Robinson-Patman Act (U.S.C. Title 15, Sec. 13a); and Counts One and Two fail to charge facts showing that the alleged acts and conduct of the defendants charged therein were so unreasonable but, on the contrary, allege facts showing that the same were reasonable and justified within the Rule of Reason".

The problems that arise out of the conflicting demands of the Anti-Trust Laws on the one hand and the Fair Trade Laws on the other need no restatement by me; and when into the cauldron are thrown the provisions of Article 2B of the Maryland Code, especially those dealing with Montgomery County and other monopoly counties, you have a witches' brew for the lawyer or client who wishes to know what may legally be done. Once again, however, I am forced to conclude that the argument does not require the dismissal of either Count at this time, but that all of the arguments presented should be given serious consideration when the evidence is in, and the question of its sufficiency to prove the offenses charged is before the court.

### III.

### Motion to Dismiss Second Count or to Require Government to Elect Between Counts.

Defendants seek dismissal of Count 2 of the indictment on the ground that it does not allege a conspiracy to monopolize violative of Section 2 of the Sherman Act. In the alternative, they seek to require the government at this time to elect to proceed under either Count One or Count Two and to dismiss the other Count, on the ground that both Counts charge facts constituting one, and only one, alleged offense. They contend that if the Sherman Act be construed to permit trial upon both Counts, it would to that extent be unconstitutional and void, as in contravention of the Fifth Amendment to the Constitution of the United States; and that such trial would place the defendants in double jeopardy and deny to them due process of law in contravention of the Fifth Amendment.

▇ The second count charges that defendants entered into and engaged in a combination and conspiracy to monopolize part of the interstate trade and commerce in alcoholic beverages. The part of that commerce which the conspiracy is alleged to have covered is quite narrow; but it is alleged that the terms of the conspiracy charged under Count Two

included agreements that manufacturers and wholesalers be required to sell alcoholic beverages only to those retailers who observe and adhere to fair trade prices, and that no alcoholic beverages sold in the State of Maryland be sold directly by a manufacturer to the Department of Liquor Control for Montgomery County or the Liquor Control Boards of other monopoly counties. It is alleged that the purpose and effect of the offense charged in Count Two has been to give wholesalers a monopoly over the sale of alcoholic beverages to Montgomery County and other monopoly counties in Maryland by eliminating direct sales by manufacturers to any such counties. These allegations are sufficient to sustain the charge of a combination to monopolize in violation of Section 2. American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575; Fashion Originators' Guild v. Federal Trade Commission, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949; Patterson v. United States, 6 Cir., 222 F. 599, certiorari denied 238 U.S. 635, 35 S.Ct. 939, 59 L.Ed. 1499; Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013, affirming, D.C., 52 F. Supp. 362.

 Passing now to the alternative argument, that the government be required to elect between Count One and Count Two and dismiss one or the other, the first question is whether offenses under Section 1 and Section 2 of the Sherman Act are identical. It is clear that they are not. American Tobacco Co. v. United States, supra; United States v. Buchalter, 2 Cir., 88 F.2d 625, certiorari denied sub nom. Shapiro v. United States, 301 U.S. 708, 57 S.Ct. 942, 81 L.Ed. 1362. In the language of Mr. Justice Burton in American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 1128, 90 L.Ed. 1575:

"* * * we have here separate statutory offenses, one a conspiracy in restraint of trade that may stop short of monopoly, and the other a conspiracy to monopolize that may not be content with restraint short of monopoly. One is made criminal by § 1 and the other by § 2 of the Sherman Act.

"We believe also that in accordance with the Blockburger case [Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306], §§ 1 and 2 of the Sherman Act require proof of conspiracies which are reciprocally distinguishable from and independent of each other although the objects of the conspiracies may partially overlap."

In the case at bar, the first count charges a conspiracy in restraint of trade that may stop short of monopoly, to wit, a conspiracy to raise, fix, maintain and stabilize the wholesale and retail prices of alcoholic beverages shipped into Maryland from manufacturers located outside of the State of Maryland. Count Two alleges a conspiracy to monopolize that is not content with restraint short of monopoly. These are not identical offenses. American Tobacco Co. v. United States, supra; United States v. A. B. Dick Co., D.C.N.D.Ohio, 7 F.R.D. 437; United States v. Buchalter, supra.

But the indictment in the case at bar goes further, and alleges that the terms of the conspiracy charged in Count One are the same as the terms of the conspiracy charged in Count Two. The acts done, the effects thereof and the named and known participants are also alleged to have been the same. They covered the same period of time and operated in the same territory on the same trade and commerce. The particulars furnished by the government with respect to each count are exactly the same.

The government has stated that "the proof * * * under Count One will be relied upon as proof of the other Counts", that there will be "no variation as far as proof is concerned", and that its evidence as to each count will be "the same evidence of that course of conduct." It is hard to see how this can amount to proof of two conspiracies which are reciprocally distinguishable from and independent of each other. "Whether the object of a single agreement is to com-

mit one or many crimes, it is in either case that agreement which constitutes the conspiracy which the statute punishes. The one agreement cannot be taken to be several agreements and hence several conspiracies because it envisages the violation of several statutes rather than one." Chief Justice Stone in Braverman v. United States, 317 U.S. 49, 53, 63 S.Ct. 99, 102, 87 L.Ed. 23. The concession of the government that its proof under the two counts will be exactly the same distinguishes this case from such cases as United States v. A. B. Dick Co., D.C.N.D.Ohio, 7 F.R.D. 437, where the court was dealing only with the allegations of the indictment.

The attempt to prove two separate conspiracies by inference and implication from the same course of conduct would almost certainly be confusing to a jury. Under these circumstances the defendants should not be required to defend against the charge of two separate conspiracies.

I will require the government, on or before February 10, 1956, to elect whether it will proceed under Count One or Count Two, and to dismiss the other Count.

## IV.
### Motions of Certain Individual Defendants.

 Certain individual defendants have moved to dismiss all three counts of the indictment as against them because in Paragraph 6 of the indictment, in the section headed "Defendants", the following sentence appears: "Said individual defendants, during the period covered by this indictment and within the applicable period of the statute of limitations have been actively engaged in the management, direction, or operation of the affairs, policies, and activities of the respective defendant organizations with which they are or have been associated, as indicated below, and within said period have authorized, ordered, or done some or all of the acts constituting and in furtherance of the offense hereinafter charged."

Defendants argue that they are specifically charged therein only in the disjunctive with having "authorized, ordered or done some or all of the acts constituting and in furtherance of the offense hereinafter charged", and therefore not directly charged with having combined and conspired in violation of the Sherman Act. This argument overlooks the fact that in each count the paragraph actually charging the offense charges that "the defendants", i. e. all the defendants, committed the offense charged in that count. Paragraph 13 of Count One charges that "The defendants named herein, and other persons to the Grand Jurors unknown, knowingly have entered into and engaged in an unlawful combination and conspiracy to raise, fix, maintain, and stabilize the wholesale and retail prices of alcoholic beverages shipped into the State of Maryland from manufacturers located outside the State of Maryland" in restraint of the trade and commerce, in violation of Section 1 of the Sherman Act. Paragraph 2 of Count Two charges that "the defendants hereinbefore named * * * have entered into and engaged in an unlawful combination and conspiracy to monopolize * * *". Paragraph 2 of Count Three charges that "the defendants hereinbefore named * * * have been engaged in an attempt to monopolize". The individual defendants making these motions are among the defendants "named herein".

Paragraph 14 charges "the aforesaid combination and conspiracy has consisted of a continuing agreement and concert of action among the defendants and others to the Grand Jurors unknown, the substantial terms of which have been and are: * * *" Paragraph 14 is realleged in Count Two; and Paragraph 3 of Count Three alleges: "In the aforesaid attempt to monopolize the defendants have done those things alleged in

subparagraphs (a) through (d) of paragraph 14 of Count One".[11]

These paragraphs sufficiently charge that each of the individual defendants committed the offense charged in the particular count.

Pursuant to defendants' motions for bills of particulars, the government has supplied certain information with respect to the participation of the several defendants in the combination and conspiracy charged in Count One and Count Two respectively, and in the attempt charged in Count Three; the government has also been required to supply additional particulars before the trial. When these particulars have been furnished, each individual defendant may move to dismiss the indictment or any count thereof against him if the particulars do not show his participation in the offense(s) charged.

### V.

### Motion to Dismiss as Against Dissolved Corporations.

The indictment in this case was filed on April 6, 1955. On June 27, 1955, prior to arraignment, separate motions to dismiss the indictment as to Dant Distilling and Distributing Company, a Delaware corporation, and Melrose Distillers, Inc., and CVA Corporation, Maryland corporations, were filed by their respective directors on the ground that each of said corporations had been dissolved on May 2, 1955, by the filing of articles of dissolution in the state of its incorporation and by unanimous consent of all of its stockholders pursuant to the statutes of the state of its incorporation. An affidavit in support of said motions shows that each of these corporations was a wholly owned subsidiary of Schenley Industries, Inc., another defendant. Formal action with respect to the dissolution of the three corporations was approved at a meeting of the board of directors of Schenley Industries, Inc., on April 27, 1955. The Federal Trade Commission on September 24, 1952, had issued a complaint (Docket No. 6048) against Schenley Industries, Inc., and certain of its subsidiaries, including Melrose and CVA. Dant had not been organized at that time. Pursuant to stipulations, the Federal Trade Commission entered a cease and desist order on March 2, 1954. This order "created certain limitations on the operations of Schenley Industries, Inc., and its subsidiaries" which "made it necessary to arrange for the distribution in the United States of all of the alcoholic beverages (except beer) through a single sales company". The name of Schenley Distributors, Inc., was changed to "Affiliated Distillers Brands Corp." on December 27, 1954, and it became the single selling company on January 1, 1955. Counsel for the company was directed to effectuate the dissolution of Melrose, CVA and Dant. The affidavit states that their dissolution "was effectuated for the commercial and legal reasons above-mentioned, none of which had anything to do with the indictment" in the present case.

The first point to be decided is what law governs the question. This criminal proceeding is brought under a federal statute, and the question whether it can be prosecuted against a deceased person or a corporation which has ceased to exist must be determined by federal law. On the other hand, the question when corporate existence ends in the case of a corporation in dissolution or which has been dissolved depends on the law of the state of its creation. Barnes Coal Corp. v. Retail Coal Merchants Ass'n, 4 Cir., 128 F.2d 645.

"We start with the firmly established premise that a dissolved corporation may thereafter be proceeded against either criminally or civilly only if authorized by the laws of

---

11. The allegations of Paragraph 15, which are realleged in Count Two, deal with what was done for the purpose of effectuating and carrying out the offense charged in the respective counts. These allegations are unnecessary and, in any event, may be clarified by particulars. United States v. Tarpon Springs Sponge Exchange, 5 Cir., 142 F.2d 125 at page 127.

the state of its incorporation. Oklahoma Natural Gas Co. v. [State of] Oklahoma, 273 U.S. 257, 259, 47 S. Ct. 391, 71 L.Ed. 634; Chicago Title and Trust Co. v. Forty-One Thirty-Six Wilcox Bldg. Corp., 302 U.S. 120, 125, 58 S.Ct. 125, 82 L.Ed. 147; Defense Supplies Corp. v. Lawrence Warehouse Co., 336 U.S. 631, 634–635, 69 S.Ct. 762, 93 L.Ed. 931. * * *" United States v. P. F. Collier & Son Corp., 7 Cir., 208 F.2d 936 at page 937; 40 A.L.R.2d 1389.

The contested issue, therefore, must turn upon the Delaware and Maryland statutes dealing with the dissolution of corporations. The controlling provision of the Delaware law is Section 42, General Corporation Law, Revised Code of Delaware, 1935, ch. 65, § 2074, as amended in 1941, ch. 132, § 11, 8 Del.C., § 278. This section is entitled "Continuation of corporation after dissolution for purposes of suit, etc.", and provides as follows:

"All corporations, whether they expire by their own limitation, or are otherwise dissolved, shall nevertheless be continued for the term of three years from such expiration or dissolution bodies corporate for the purpose of prosecuting and defending suits by or against them, and of enabling them gradually to settle and close their business, to dispose of and convey their property, and to divide their capital stock but not for the purpose of continuing the business for which said corporation shall have been established; provided, however, that with respect to any action, suit, or proceeding begun or commenced by or against the corporation prior to such expiration or dissolution and with respect to any action, suit or proceeding begun or commenced by or against the corporation within three years after the date of such expiration or dissolution, such corporation shall only for the purpose of such actions, suits

or proceedings so begun or commenced be continued bodies corporate beyond said three-year period and until any judgments, orders, or decrees therein shall be fully executed."

Does the word "suits" as contained in the initial portion of this section, or the words "any action, suit, or proceeding" as contained in the proviso, encompass a criminal prosecution such as the instant case?

The exact question has been presented to the Courts of Appeals of three Circuits. The Sixth and Tenth Circuits held that sufficient corporate life did not continue after dissolution to permit the prosecution of the criminal case. United States v. Line Material Co., 6 Cir., 202 F.2d 929; United States v. Safeway Stores, 10 Cir., 140 F.2d 834. The Seventh Circuit held the contrary. United States v. P. F. Collier & Son Corp., 7 Cir., 208 F.2d 936, 939, 40 A.L.R.2d 1389.[12] The decision of the Seventh Circuit was based in large part upon:

(1) The Federal Rules of Criminal Procedure. The Seventh Circuit said: "We agree that the word 'suit' or the word 'action' standing alone might reasonably be held as not including a criminal prosecution, but when the word 'proceeding' is added we think a combination is presented which is well near inclusive of all forms of litigation. * * Any doubt on this score is readily dispelled by reference to the Federal Rules of Criminal Procedure, 18 U.S.C.A. Rule 2 provides, 'These rules are intended to provide for the just determination of every criminal proceeding.' In scores of instances, a criminal prosecution is referred to as a 'proceeding.'" The court cited paragraphs (a), (b) and (c) of Rule 21 as typical.

(2) The decision of the Fourth Circuit in Bahen & Wright, Inc. v. Commissioner of Internal Revenue, 176 F.2d 538, 539, which construed the same Delaware statute as follows:

12. See also In re Grand Jury Subpoenas Duces Tecum Addressed to Canadian Intern Paper Co., D.C.S.D.N.Y., 72 F. Supp. 1013; United States v. Cigarette Merchandisers Ass'n, Inc., D.C.S.D.N.Y., 1955, 136 F.Supp. 214, Weinfeld, J.

"\* \* \* The Delaware statute explicitly provides for continued corporate existence for as long as may be necessary to reach a final determination of any 'proceeding' as well as any 'action or suit' begun by or against a corporation within three years of its dissolution. The word 'proceeding' is obviously broader than action or suit and should be given full effect in order to achieve the fundamental purpose of the statute."

(3) The decision of the Supreme Court of Delaware in Addy v. Short, 8 Terry 157, 47 Del. 157, 89 A.2d 136, 139, wherein the court made some observations pertinent to the question at issue here. Referring to section 42, the Delaware court said:

"During the three-year period of winding up, the corporation functions exactly as it had functioned before dissolution, with the important qualification that its powers are limited to closing its affairs and do not extend to carrying on the business for which it was established. But as concerns the property it had at the time of dissolution, its title and possession are unimpaired. Whatever rights it had, of whatever nature, are preserved in full vigor during the three-year period. Any other conclusion would contravene the plain language of the statute."

The Seventh Circuit, in United States v. P. F. Collier & Son Corp., supra, then said:

"If, as the court stated, every right possessed by a corporation at the time of dissolution is preserved in full vigor during the three-year period, we see no reason why by the same token its liabilities, both civil and criminal, are not also preserved. Following the statement lastly quoted the court further stated:

" 'The suggestion that the act of dissolution in itself in some fashion works a forfeiture or extinguishment of a legal right, by analogy to the death of an individual, is therefore on the face of the statute unsound.'

"Again, if dissolution by reason of the statute works no extinguishment of a legal right, we discern no reason why it works an extinguishment of a legal liability, whether civil or criminal."

This decision is in line with principles announced by the Fourth Circuit in analogous cases. In Barnes Coal Corp. v. Retail Coal Merchants Ass'n, 4 Cir., 128 F.2d 645, a triple damage suit under 15 U.S.C.A. § 15, the Court, speaking through Chief Judge Parker, said:

"On the second question, we entertain no doubt as to the survivability of the cause of action when the statute creating it is interpreted in the light of the common law rule relating to survival. While there might be some doubt as to this were we to look only to the ancient decisions, we think that the rule is to be determined, not merely by a consideration of the state of the common law at the time of the enactment of the statute de bonis asportatis in the reign of Edward III, or even by a consideration of the common law rule at the time of the American Revolution, but in the light of its subsequent development and the decisions interpreting it. It must be remembered, in this connection, that the common law is not a static but a dynamic and growing thing. Its rules arise from the application of reason to the changing conditions of society. \* \* \*" 128 F.2d at page 648.

Business corporations such as are involved in this case did not even exist at common law. Moreover, at common law, criminal proceedings did not lie against such corporations as did exist. Finally, dissolution at common law was equated to civil death, with total extinction of corporate existence, upon which event the corporate realty reverted to the donors thereof, the corporate personalty escheated to the State, and debts ei-

ther to or from the corporation were extinguished. 1 Blackstone, Commentaries, 467–485.

The corporate dissolution provided for by today's statute law is an entirely different conception, and one which requires continued corporate life. This principle is recognized and embodied in the Delaware statute, of which Judge Soper said: "Statutes of this type are broadly remedial." 176 F.2d at page 539.

The principle is also recognized and embodied in the Maryland statute which is applicable to defendants Melrose Distillers, Inc., and CVA Corporation. Art. 23, § 72 of the Maryland Code contains the following provision:

"(b) The dissolution of the corporation shall be effective when the articles of dissolution have been accepted for record by the Commission, provided, however, that the corporation *shall continue in existence* for the purpose of paying, satisfying and discharging any existing debts and obligations, collecting and distributing its assets, and doing all other acts required to liquidate and wind up its business and affairs." (Emphasis supplied.)

Section 78(a) of Art. 23 provides:

"The dissolution of a corporation shall not relieve its stockholders, directors or officers from any obligations and liability imposed on them by law; nor shall such dissolution abate any pending suit or proceeding by or against the corporation, and all such suits may be continued with such substitution of parties, if any, as the court directs."

In Diamond Match Co. v. State Tax Commission, 175 Md. 234, 200 A. 365, 370, a tax case, the Court of Appeals of Maryland referred to the dissolution statutes as follows:

"These provisions are broad, and intended to cover every liability, although of an undetermined amount, and embrace the potential obligation contingent upon a liability to pay taxes subsequently levied by statute upon an assessable basis of a precedent date."

 I conclude that under the applicable Delaware and Maryland statutes, the corporate existence of the dissolved corporations continues to a sufficient extent to permit the prosecution of this criminal proceeding.