**UNITED STATES of America**

v.

**MARYLAND STATE LICENSED BEVERAGE ASSOCIATION, Inc., Maryland Liquor Package Stores Association, Inc., Maryland Institute of Wine and Spirit Distributors, Inc., National Distillers Products Corporation, Joseph E. Seagram & Sons, Inc., Distillers Distributing Corp., Hiram Walker & Sons, Inc., Hiram Walker, Incorporated, Gooderham & Worts, Ltd., James Barclay & Co., Ltd., Schenley Industries, Inc., Affiliated Distillers Brands Corp., McKesson & Robbins, Inc., McCarthy-Hicks, Inc., Churchill, Ltd., The Kronheim Co., Inc., R. W. L. Wine & Liquor Co., Inc., The Madera Bonded Wine & Liquor Co., Reliable Liquors, Inc., Gillet-Wright, Inc., John A. Menton, Jack Wulfert, and I. William Schimmel.**

Civ. No. 9122.

United States District Court
D. Maryland.

Nov. 26, 1958.

Wilford L. Whitley, Jr., Alexandria, Va., John H. Earle, Greenville, S. C., John C. Fricano, Attys., Dept. of Justice, Washington, D. C., and Leon H. A. Pierson, U. S. Atty., Baltimore, Md., for plaintiff.

G. C. A. Anderson and David R. Owen, Baltimore, Md., and Edgar E. Barton, New York City, for Jos. E. Seagram and Distillers Distributing Corp.

Raphael Walter, Hilary W. Gans, and Lawrence I. Weisman, Baltimore, Md., for Schenley Industries, Inc., and Affiliated Distillers Brands Corp.

THOMSEN, Chief Judge.

This is a civil action filed by the government seeking injunctive relief for alleged violations of sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1, 2. Defendants are two associations of retailers, one association of wholesalers, one executive officer of each association, ten manufacturers, and seven wholesalers, engaged in the alcoholic beverage industry in Maryland.

The evidence shows that between 1947 and 1955 certain retailers, wholesalers and their respective associations organized a conspiracy to require manufacturers to establish fair trade prices for all brands sold in Maryland, to enforce the observance of said prices, and to refrain from selling directly or through a wholesaler to the Department of Liquor Control for Montgomery County at prices less than the wholesalers' resale prices. Different aspects of the conspiracy were emphasized at different periods, and from time to time defendant manufacturers adhered to the conspiracy for various purposes. And at one period retailers were incited to boycott the products of those manufacturers who did not establish and enforce fair trade or who sold directly or indirectly to Montgomery County at low prices.

An earlier criminal case [1] based upon the same conspiracy resulted in pleas of nolo contendere by most of the defendants, including the two Seagram corporations and the two Schenley corporations who are contesting the instant action. All other defendants herein have agreed to consent decrees.[2] Neither the Seagram nor the Schenley defendants deny the existence of a conspiracy, although Schenley contends that there were several separate conspiracies. The Seagram defendants admit adherence to the conspiracy for limited periods for limited purposes. The Schenley defendants deny adherence to any conspiracy, but I find that there was a single conspiracy and that the Schenley defendants adhered to it.

The principal contest has been about relief. The government seeks (1) a temporary suspension of all fair trade activity by defendants in Maryland, including the cancelling of all fair trade contracts to which defendants are parties, and (2) an order requiring the Schenley and Seagram defendants to sell to Montgomery County at the same price they sell to wholesalers, as well as (3) other injunctive relief about which there is no material dispute.

The term "liquor" will be used in this opinion to mean all alcoholic beverages except beer, ale, porter, and stout. The term "manufacturer" has been used throughout the case to mean a person who operates a plant within the United States for distilling, rectifying, blending, fermenting, or bottling any liquor,

1. United States v. Maryland State Licensed Beverage Association, D.C.D.Md., 138 F.Supp. 685, the relevant parts of which were affirmed sub nom. Melrose Distillers, Inc., v. United States, 4 Cir., 258 F.2d 726, certiorari granted on a point not material here, 79 S.Ct. 125. See also United States v. Maryland State Licensed Beverage Association, 4 Cir., 240 F.2d 420.

2. The Maryland State Licensed Beverage Association and John A. Menton, its executive vice-president, allowed a default judgment to go against them. A decree similar to that entered against the other associations and individuals will be entered against them.

or who imports any liquor into the United States, or who distributes liquor to a wholesaler for resale to a retailer.

### The Defendants

Defendant Maryland Institute of Wine and Spirit Distributors, Inc. (wholesalers' association) is a state-wide association of wholesale dealers, incorporated in 1936. All defendant wholesalers except Kronheim were members.

Defendant Maryland Liquor Package Stores Association (package store association) is a state-wide association of licensed "off-premise" dealers, which under some variation of that name has been active since 1947.

Defendant Maryland State Licensed Beverage Association, Inc. (MSLBA) is a state-wide association of licensed "on-premise" retail dealers in alcoholic beverages. Such dealers may sell package goods as well. Fourteen county or local associations of licensed retailers also are members. MSLBA was organized in May, 1950. There had formerly been a state-wide organization known as Maryland Retail Liquor Dealers' Association, Inc., which sometimes called itself the Maryland Tavern Owners' Association.

The Liquor Industry Advisory Board (Board), sometimes referred to as the Advisory Committee or the Industry Committee, was in existence during 1948, 1949, and 1950. It comprised three representatives each from the wholesalers' association, the package store association, and the tavern owners' association. The newly organized MSLBA became a member sometime during 1950.

The wholesalers, acting through their associations, were instrumental in organizing both the Board and MSLBA. Defendant John A. Menton, who had been director of the Board, became executive vice-president of MSLBA.

Defendant manufacturers are: (1) Joseph Seagram & Sons, Inc. (Jos. Seagram). (2) Distillers Distributing Corp., the present Seagram sales company, which after August 1, 1954, operated in three divisions, (a) Seagram, (b) Calvert, and (c) Frankfort. Before August 1, 1954, the Calvert and Frankfort sales organizations were separate corporations, known as Calvert Distillers Corp. (Calvert) and Frankfort Distillers Corp. (Frankfort). They were merged into the Seagram sales organization, then known as Seagram Distillers Corp. (Seagram), which changed its name to Distillers Distributing Corp. and is now known as House of Seagram, Inc. (3) Schenley Industries, Inc. (Schenley), primarily a holding company. (4) Affiliated Distillers Brands, Inc. (Affiliated), the present Schenley sales company, which since December 31, 1954, has operated in several divisions. Before December 31, 1954, the Melrose, Dant and CVA sales organizations were separate corporations, which had been acquired by Schenley at different times. (5) National Distillers Corp. (6–9) Four Hiram Walker companies. (10) McKesson & Robbins, Inc.

Defendant wholesalers are: (1) McCarthy-Hicks, the exclusive distributor in Maryland of Seagram name brands. (2) Reliable, the sole distributor for Calvert after April, 1950. (3) R.W.L., a distributor of Calvert products, from January, 1947 to April, 1950, and of certain Schenley brands from April, 1950 until June, 1955. (4) Churchill, Ltd., the distributor of the Melrose brands and brands of other manufacturers. (5) Madera, a distributor of the Dant brands and brands of other manufacturers. (6) Kronheim, with headquarters in Washington, D. C., the distributor for National. (7) Gillet-Wright, the distributor for Hiram Walker and Gooderham & Worts.

### Trade and Commerce Involved

About 85% of all liquor sold by retailers in Maryland is produced outside the State and shipped into the State. Defendant manufacturers produce more than 60% of all liquor sold in Maryland. Defendant wholesalers sell about 86% of all liquor sold to retailers in Maryland. Alcoholic beverages are marketed in Maryland in a continuous flow of shipments from manufacturers located out-

side the State through wholesalers and retailers or the liquor control boards of monopoly counties to the consuming public. For a statement of the pertinent Maryland statutes, regulations and decisions, see the opinion of this court in the criminal case, United States v. Maryland State Licensed Beverage Association, D.C., 138 F.Supp. 685, pages 693 to 697.

In the criminal case defendants contended (1) that the acts charged in the indictment were expressly or impliedly sanctioned by Maryland law, actually implemented the State law, and were therefore beyond the reach of the Sherman Act; and (2) that under the Twenty-first Amendment the states have powers in the regulation of the liquor traffic which are paramount to the Commerce Clause, Const. Art. 1, § 8, cl. 3, and to statutes enacted pursuant thereto, that Maryland has preempted the field relating to the regulation of prices at which intoxicating beverages may be sold, and that the policy and provisions of the Maryland statute are in conflict with the Sherman Act.

These contentions were fully discussed and denied by this court, 138 F.Supp. at pages 699–703, and were summarily denied by the Court of Appeals, sub. nom. Melrose Distillers, Inc., v. United States, 4 Cir., 258 F.2d at pages 729–730, on the ground that the acts charged were not permitted, sanctioned, or encouraged by the announced governmental policy and law of the State of Maryland.

The conspiracy and the acts charged in the indictment in the criminal case were substantially the same as the conspiracy and the acts proved in this civil case. The Maryland law is therefore no defense to defendants herein, but the policy of the Maryland law will be considered in determining what relief should be granted.

The Maryland statute empowers the liquor control board of each monopoly county to purchase alcoholic beverages direct from any manufacturer or wholesaler and to sell such alcoholic beverages to the consuming public "at such prices as may be determined by the board, which prices shall be uniform in all stores in the said county." [3] The Department of Liquor Control for Montgomery County (Montgomery County) has operated for many years both as a wholesaler and as a retailer. From 1947 to 1954 Montgomery County bought direct from some manufacturers at the same price they charged wholesalers, and bought from some wholesalers at that price plus 50¢ per case. A few manufacturers and other suppliers, notably the Seagram sales company distributing V. O. and 7-Crown and its wholesaler, McCarthy-Hicks, refused to sell to Montgomery County at less than the price charged by wholesalers to retailers. The other monopoly counties have customarily purchased liquor from licensed wholesalers at prices similar to those charged by wholesalers to licensed retailers.

Montgomery County purchases 1,100 different items from 70 manufacturers and other suppliers. It sells liquor *through* ten county-operated dispensaries. It sells liquor *to* twelve country clubs and three restaurants which have retail licenses, and it sells beer and wine *to* 170 retail licensees. Gross sales increased from $2,443,673 in 1950 to $4,352,625 in 1955; the net profit to the County increased from $430,206 to $796,134.

As a retailer, Montgomery County competes with retailers in Prince George's County, Howard County and Frederick County, Maryland, and in the District of Columbia. The Maryland retailers are subject to the state's fair trade law [4] which binds non-signers as well as signers. Home Utilities Co. v. Revere Copper and Brass, Inc., 209 Md. 610, 122 A.2d 109. There is no fair trade law in the District. Since 1948 the Montgomery County dispensaries have

---

3. Ann.Code of Md., 1957 ed., Art. 2B, sec. 163 (b) and (c).

4. Art. 83, secs. 102–110.

offered discounts—"week-end specials"—on Fridays, Saturdays and Mondays each week. Each brand of liquor is discounted about once every five weeks. During the Christmas holidays the discounts extend through two entire weeks.

Montgomery County priced its goods to compete with retailers in the District of Columbia, although at one time it agreed with Kronheim and National to price National products at figures which would not compete with Kronheim's Washington customers. Generally, Montgomery County's principal objective in operating its dispensaries was to make a profit, rather than to comply with any declared purpose of the Maryland alcoholic beverage law.

### The Conspiracy

Price cutting was not a problem during World War II, but in 1947, when liquor became more plentiful, price cutting was resumed. Those manufacturers who believed in fair trade executed new fair trade contracts with retailers in Maryland and announced that they would enforce existing contracts. The package store association and the tavern owners' association were eager to have all manufacturers establish fair trade prices for their products, and some of the defendant manufacturers worked with the associations in an effort to persuade all retailers to sign fair trade contracts. The horizontal cooperation of the retailers to *establish* fair trade quickly developed into horizontal cooperation of the retailers and their associations, aided and financed by the wholesalers' association, to *enforce* fair trade. The Liquor Industry Advisory Board, composed of three representatives from each association, operated a shopping service and furnished reports of fair trade violations to manufacturers and their wholesalers, on the basis of which some manufacturers, through their own lawyers, issued warnings to and brought injunction suits against offending retailers, sometimes reporting to the associations what they had done.

The two Seagram defendants, the two Schenley defendants, National and Hiram Walker participated in this aspect of the conspiracy during 1948.

After some months the manufacturers decided, on advice of counsel, that no warning letters should be sent or suits filed until their own lawyers had made an additional investigation, but the manufacturers continued severally to accept complaints of violations furnished by the associations to the manufacturers directly or through their respective wholesalers, and to refer those complaints to their Maryland lawyers, who frequently made their investigations through the same shopping service employed by the Board.[5]

Price cutting became increasingly prevalent during 1949. The Seagram companies fearing that price wars would damage their trademarks and the liquor business in general, undertook a nationwide campaign to persuade the retailers to observe fair trade prices. A vice-president of Calvert spoke in Baltimore in January, 1950, at a meeting of retailers which was arranged by Calvert employees with the cooperation of the leaders of the trade associations. He stated that the purpose of fair trade is to protect not only the manufacturers' brands but the business of the retailers.

At the end of 1950 the Board was dissolved. Meanwhile, earlier in 1950, MSLBA had been organized, with the cooperation of the wholesalers, and Menton, who had been executive secretary of the Board, became executive vice-president of MSLBA. After 1950 representatives of the manufacturers, as well as the wholesalers, continued to cooperate with the retailers' associations in the enforcement of fair trade, meeting with their officers and governing boards and discussing the enforcement of fair trade. On at least one occasion

---

5. It is not necessary to decide in this case whether the facts set out in this paragraph, standing alone, would constitute a violation of the antitrust laws by the manufacturers.

a representative of Seagram agreed in open meeting of the MSLBA Board of Governors to take action with respect to a specific retailer.

On May 21, 1951, the Supreme Court decided Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035, holding that under the Miller-Tydings Act fair trade contracts in interstate commerce could not be enforced against non-signers. Immediately all levels of the industry went into action. Defendant manufacturers who had theretofore enforced fair trade contracts decided independently of each other and of any pressure to continue to enforce fair trade wherever possible by means of intrastate operations or by obtaining fair trade contracts from 100% of the retailers in each area. At the same time the retail associations urged the manufacturers to continue fair trade enforcement, and many manufacturers, directly and through their respective wholesalers, met with and cooperated with the retail associations in an effort to persuade 100% of the retailers to sign. There was at least one meeting in Baltimore attended by retailers, wholesalers and some manufacturers. This aspect of the conspiracy took the form of a typical hold-the-line price-fixing conspiracy.

After passage of the McGuire Act in July, 1952, 15 U.S.C.A. § 45, defendant manufacturers decided, independently of any pressure from the associations, to revive their fair trade programs. New price lists were sent to all retailers, as required by law. However, in late 1952 and early 1953 the retail associations requested information from the several manufacturers with respect to their fair trade prices, products and policies, and many of the manufacturers supplied the information to the associations directly or through their wholesalers. In its letter to the retailers Seagram solicited the support of the retailers in a "joint endeavor to stabilize conditions". Officers of other manufacturers addressed the MSLBA conventions at various times.

Since 1947 at least, the associations had been disturbed by the fact that many manufacturers were selling to Montgomery County at the same price they sold to wholesalers or were selling to Montgomery County through wholesalers at a mark-up of only 50¢ over that price, which amounted to the same thing and permitted Montgomery County to undersell retailers in the neighboring counties of Maryland. In March, 1947, the package store association and the tavern owners' association sent a joint letter to the manufacturers protesting such action and requesting replies. Between 1947 and 1954, the associations lobbied to prevent the creation of additional monoply counties, discussed sporadically at association meetings the possibility of taking some action with respect to Montgomery County, and from time to time brought Montgomery County's price-cutting activities to the notice of the manufacturers.

In 1954 the Montgomery County situation came to a head. The matter was discussed at a meeting of the executive committee of the MSLBA in April, 1954, and the manufacturers were made to realize that if they or their distributors sold to Montgomery County at a low price they ran the risk of losing business elsewhere. The package store association also exerted pressure. In June the board of governors of MSLBA authorized its president to appoint a committee to discuss the matter with representatives of manufacturers and wholesalers. The procedures to be followed were discussed at the August meeting of the executive committee, and Menton, as executive vice-president of MSLBA, sent a letter to the presidents of 31 manufacturers stating that continued cut-rate and price-leader selling by Montgomery County liquor dispensaries was seriously injuring licensees in the adjoining counties and throughout Maryland, was contributing to the breakdown of fair trade price maintenance, and that individual retailers had requested the association to determine what action the respective

distillers would take to help stop those "abuses". The letter asked for replies. The cooperation among the various levels of the industry was so close that Seagram's wholesaler, McCarthy-Hicks, was given a draft of the letter to send to Seagram before the letter was mailed. Defendant manufacturers reacted to the letter in different ways. Some of them supplied the information to Menton orally through their Maryland representatives or wholesalers; some of them mailed their replies. On September 3, defendant Wulfert, president of the package store association, sent out a generally similar letter. The Maryland representatives of the manufacturers made it clear to their home offices that a boycott was in the making against those manufacturers who did not acquiesce in the desires of the retailers and the two associations, with whom some of the wholesalers were more or less openly cooperating. At the annual convention of MSLBA in September, 1954, at which, as usual, all the defendant manufacturers maintained hospitality suites, a large "scoreboard" listed the manufacturers with red, yellow or green lights opposite their names. The MSLBA bulletin reported:

"Probably the most prominent topic of discussion at the recent MSLBA Convention was the tremendous scoreboard 'Report on Distiller Policies' displayed in the lobby of the Convention Headquarters hotel.

"Dramatically displaying information for Maryland retailers, a green flasher opposite a distiller's name indicated that the retailer could 'Buy With Confidence' those brands offered by that distiller; a yellow flasher advised the retailer to 'Proceed with Caution' in buying the distillers' brands so indicated; while the retailer was to 'Stop And Think' about purchasing distiller brands where a red flasher was opposite the distiller's name.

"In order to refresh the minds of those who attended the Convention, and to inform those Maryland retailers who did not attend the session, a reproduction of the 'scoreboard' report has been prepared for inclusion in this month's issue of the 'Bulletin'. Instead of the flasher indications used at the convention, this sheet has used the green, yellow and red indications in printing the distillers' names. Our hoped-for objective is to see every distiller's name eventually indicated in green —fair trade prices for all without discrimination. This 'scoreboard' sheet will go out to all retailers periodically with the latest revisions in the three color indications.

"This display was a center of interest to all retailers at the Convention, as well as the wholesale firms' representatives. Distillery men were busily arguing pro or con and State officials and members of the Legislature who were attending the convention were interested spectators. The main topic of discussion seemed to be the future methods that would be used to give publicity to brand policies.

"Of significance was the impressive assurance of backing which the retailers in the State have received. On the basis of recent surveys, the top brands already on record as supporting 'nondiscriminatory' policies account for over forty percent (40%) of Maryland's distilled spirits volume. When the volume of other suppliers who are expected to affirm similar 'nondiscriminatory' policies is added, the distillers' support of the retailers seems overwhelming."

The boycott was continued for four or five months until it was brought to a halt by the indictment in the criminal case. Other letters were sent by the associations and their members, there were many conferences and telephone conversations in furtherance of the conspiracy, and the "scoreboard" was brought up to date in the February, 1955, issue of the MSLBA bulletin. During this phase of

this conspiracy, one manufacturer after another which had been selling to Montgomery County directly or indirectly at a low price changed its policy, increased its price, and notified the retailers' associations directly or indirectly what had been done. These companies included Calvert and Gallagher & Burton (Seagram companies), Schenley Distributors, National, Hiram Walker, and McKesson & Robbins.

### Seagram

The Seagram companies concede that they joined the conspiracy and from time to time took action in furtherance thereof, but they contend that such activity was occasional and sporadic.

During the pertinent period defendant Jos. Seagram manufactured the Seagram brands known as V.O., 7-Crown, and Golden Gin. It also owned several manufacturing companies, including Calvert Distilling Company, Carstairs Brothers Distilling Company, Frankfort Distilling Company, Hunter Wilson, Paul Jones, Gallagher & Burton, and Kessler. Prior to August 1, 1954, Jos. Seagram owned three sales corporations: Seagram, Calvert, and Frankfort. Products manufactured by Jos. Seagram were sold to Seagram which marketed those products. Calvert purchased and marketed the products manfactured by the Calvert and Carstairs distilleries. Frankfort purchased and marketed the products manufactured by the Frankfort, Hunter Wilson and Paul Jones distilleries. A division of Seagram also purchased and marketed products manufactured by the Kessler and Gallagher & Burton distilleries.

On August 1, 1954, Calvert and Frankfort merged into Seagram, which changed its name to Distillers Distributing Corporation. On August 18, 1955, it changed its name again to House of Seagram, Inc. After August 1, 1954, the products of all the distilleries listed above were sold to the one distributing corporation, which marketed the products through three separate divisions corresponding to the old sales corporations, namely, Seagram, Calvert and Frankfort.

Jos. Seagram and its wholly owned subsidiaries, Seagram, Calvert and Frankfort, had a number of common officers and interlocking directors, and the same general counsel. The establishment, maintenance and enforcement of fair trade prices of alcoholic beverages distributed by Seagram, Calvert and Frankfort in Maryland was controlled by the policy of Jos. Seagram.

The men controlling the policies of the Seagram companies believed in fair trade to protect their brand names and to prevent price wars. Upon the enactment of fair trade laws in the 1930's, Seagram, Calvert and Frankfort entered into fair trade contracts and established fair trade programs which have been maintained in all states with fair trade laws. In 1937 they employed Senator Tydings' law firm to assist in the establishment, maintenance and enforcement of their fair trade program in Maryland. Early in 1947, when liquor became more plentiful, the Seagram companies revived their fair trade program, which had been dormant because it was not necessary during wartime shortages.

On March 5, 1947, A. V. Retalliata, president of the package store association and himself a retailer, signed a Calvert fair trade contract, and on March 10, 1947, signed a Seagram fair trade contract. The companies publicized those contracts and the fact that they had established minimum retail prices for their brands under the Maryland Fair Trade Act. For example, on March 27, 1947, Calvert's assistant general sales manager stated:

> "Calvert is taking this step in accordance with its long established policy of assisting licensees to make a fair profit on Calvert products. The overwhelming majority of retailers in Maryland * * * with whom Calvert is the leading brand * * * are definitely in favor of fair trade regulations. We are glad to cooperate with them to help them

protect their investments and to operate their businesses on a profitable level. Price cutting is no substitute for sound merchandising. We believe it is good business practice to prevent the breakdown of profit margins on well-known brands by those few retailers whose only recourse in the face of competition is cutting prices.

"Calvert distributors in Maryland, Roma Wine & Liquor Company, and Reliable Liquors, Inc., are wholeheartedly in accord with this move."

On May 8, Calvert's Maryland representative reported to the home office: "Regarding my work in Maryland on the fair trade agreements, I have been in constant touch with the Package Store Owners Association, and they are very much in accord with our cooperation."

The three sales companies did not have a uniform policy with respect to Montgomery County. Frankfort at all pertinent times sold Montgomery County direct. Sometime in April, 1947, Calvert ceased selling Montgomery County direct. R.W.L., its distributor, began selling Montgomery County at 50¢ a case over R.W.L.'s cost. When handling costs are considered, such a price is equivalent to a purchase direct from the distiller at the distiller's price to wholesalers. This practice continued until the autumn of 1954. Seagram and its distributor, McCarthy-Hicks, at all times refused to sell Montgomery County at less than the distributor's posted price to retailers. Seagram and McCarthy-Hicks made much of this in currying favor with the retailers during the entire period 1947–1955.

During 1948 the Seagram companies participated in that aspect of the conspiracy dealing with the enforcement of fair trade. See "The Conspiracy", supra.

During 1949 and 1950, on advice of their general counsel, they stopped sending warnings or filing suits on the basis of the Board's shopping reports, but they continued to accept complaints of violations furnished by the Board and to have their lawyer make a new investigation and pursue the matter further if necessary.[6]

In January, 1950, a vice-president of Calvert and its assistant general sales manager spoke at a meeting of retailers which had been arranged with the cooperation of the leaders of the associations and had been announced by Menton as chairman of the Advisory Council.

The decision of the three Seagram companies to try to preserve fair trade after the Schwegmann decision was made without pressure from the outside. However, in June, 1951, Seagram's state manager addressed the regular quarterly meeting of the board of governors of MSLBA and explained Seagram's plans for the post-Schwegmann period. Immediately after his speech he discussed with the Board what should be done in the case of a particular retailer who was said to be selling at a cut-rate price. The president of Frankfort sent a telegram to MSLBA, in which he said Frankfort contemplated early action to obtain 100% retailer signatures to fair trade contracts, and would "welcome your support in this campaign in view of gratifying news that your entire membership of over 1,400 retailers favors continued stability in Maryland market structure."

After the passage of the McGuire Act, Seagram, Frankfort and Calvert issued form letters to the trade enclosing identical fair trade notices, sample copies of fair trade agreements and price lists. Their decision to do this was made without pressure from outside and was not illegal, but the Seagram letter exhorted Maryland retailers to support "a joint endeavor to stabilize conditions". Newspaper advertisements, press releases and letters to retailers were sent out which emphasized that it was the policy of the Seagram companies "that every retailer should make a profit".

6. See footnote 5.

At the September, 1954, convention of MSLBA, when the "scoreboard" was so prominently exhibited, Seagram's director of trade relations addressed the convention. In the fall of 1954, Calvert and its wholesaler, Reliable, agreed that the price to Montgomery County should be increased to the price charged to retailers. This action was motivated largely by the threat of a boycott and the desire to have a green light at the MSLBA convention. Seagram also, for mixed motives including MSLBA pressure, refused to sell the Gallagher & Burton brand to Montgomery County direct.

## Schenley

At all times during the pertinent period Schenley was primarily a holding company except for the production of some California wines and brandy. Until December 31, 1954, liquor produced and imported by its various wholly owned subsidiaries was sold and distributed in Maryland by other wholly owned subsidiaries, Affiliated, CVA, Melrose after 1948, Dant after 1953, and two others unimportant here. As of December 31, 1954, Melrose, CVA and Dant ceased operations, and thereafter the business of those subsidiaries in Maryland and elsewhere was conducted by Affiliated through separate divisions. Melrose, CVA and Dant were dissolved on or about May 5, 1955. Schenley had many common officers and interlocking directors with its various subsidiaries.

Beginning not later than December, 1948, Schenley and Affiliated enforced fair trade prices on their products through their then distributor, E. Kahn & Co., Inc. This was permitted by the Maryland law and would not have violated the antitrust laws if Schenley, Affiliated and Kahn had not cooperated with defendant trade associations and the Board in connection therewith. Complaints and shopping reports were received by Kahn from the Board and forwarded (sometimes with copy to Menton) Schenley's Maryland attorney, requesting follow-up investigations or suit for injunction. Thereafter, Schenley's attorney obtained a new shopping report and, after consultation with and authorization from Schenley's legal department, sent warnings or instituted suits in proper cases. This enforcement of fair trade prices of Schenley products, with the cooperation of a group of competing retailers, constituted adherence by Schenley and Affiliated to the conspiracy.

After R.W.L. succeeded Kahn as Schenley distributor in Maryland in June, 1950, Affiliated executed its own Maryland fair trade contracts and undertook its own enforcement thereof. For a short period thereafter, shopping reports from the Board were received by R.W.L., violations were discussed and thereafter confirmed in writing by R.W.L. to Schenley. The list of price-cutting retailers so reported to Schenley was forwarded to Schenley's Maryland attorney for follow-up investigations and enforcement measures if indicated. After the middle of 1950 however, there was little fair trade enforcement activity—warning letters or litigation—by any of the Schenley companies. Menton complained that Schenley was not sufficiently active in enforcing fair trade, but Schenley did send representatives to persuade retailers to adhere to fair trade prices. During the period 1948 to 1950 Schenley also engaged in some fair trade enforcement inspired by its own investigations.

After the Schwegmann decision, the Schenley companies made their own policy decisions, uninfluenced by the letters from the retailers' associations. On May 23, by telegram, Schenley urged all retailers to maintain an orderly market. Its wholesaler, R.W.L., published an advertisement dated May 25, addressed to retailers, urging them to "hold the line". Copies of the telegram and the ad were sent to Menton by R.W.L. Menton had previously written identical letters to all manufacturers urging them to enter into the necessary individual agreements with every retailer and requesting replies. A representative of Affiliated called on Menton during the middle of June and discussed Schenley's plans. A week later he sent word to

Menton through R.W.L. that the details had been cleared by his legal authorities. On July 11, 1951, Affiliated authorized R.W.L. to enter into intrastate fair trade contracts on its leading brands. R.W.L. entered into one such contract but did not issue price lists to the trade. Based on the cooperation of Schenley and Affiliated with their successive distributors in this and other matters, I find that the R.W.L. "hold the line" advertisement was published with the approval of Schenley, and that all of the acts set out in this paragraph constituted acts by Schenley and Affiliated in furtherance of this aspect of the conspiracy.

When the Montgomery County phase of the conspiracy became acute, R.W.L. was selling Schenley Reserve and a number of other Schenley brands to Montgomery County at the cost to wholesalers plus 50¢. As a result, Affiliated received a yellow light on the "scoreboard" at the September convention of MSLBA. Thereafter pursuant to pressures of MSLBA and the package store association, Schenley and Affiliated consented that R.W.L. should charge Montgomery County the same price that it charged Maryland retailers. R.W.L. informed Montgomery County that it was raising its prices. R.W.L. said that it had no objection to Affiliated selling to Montgomery County direct and offered to help arrange such direct sales. This statement was made with the conviction that Schenley and Affiliated would not sell direct and in an effort to preserve as much good will for Schenley products in Montgomery County as possible while yielding to the pressure of the retailers.

I find that there was a single conspiracy with shifting emphasis from time to time, and that Schenley and Affiliated joined the conspiracy and performed various acts in furtherance thereof. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 248, 253, 60 S.Ct. 811, 84 L.Ed. 1129; Allen v. United States, 7 Cir., 4 F.2d 688, 692; Lefco v. United States, 3 Cir., 74 F.2d 66, 68.

## Relief

The consent decree heretofore entered against all defendant manufacturers except the Seagram and Schenley companies is quite comprehensive. Among other provisions it enjoins the consenting defendants from cooperating in any way with any other person: to fix the prices at which liquor is sold to third persons in Maryland; to enforce any such price; to boycott or induce others to boycott; to induce any manufacturer to refuse to sell to a monopoly county; or to induce a manufacturer to sell to a monopoly county on the understanding that a designated resale price be maintained. It enjoins the consenting defendants from certain individual action, e. g. requiring a wholesaler to adopt or enforce adherence to minimum resale prices; communicating with a wholesaler for the purpose or with the effect of inducing him to refrain from selling to any person, group or class of persons in Maryland. The consenting defendants are restrained from conspiring among themselves or with any association: to refuse to sell to a monopoly county; to refuse to sell to a monopoly county except on the understanding that minimum prices or other conditions of resale will be maintained; or to refuse to sell to a monopoly county at prices less than their customary price charged to retailers. The decree enjoins not only what is specifically prohibited, but all similar activity and attempting, urging, or inducing any such activity.

Each consenting manufacturer is required to sell to Montgomery County all brands listed on a schedule attached to the decree and all brands thereafter offered to any monopoly state, at the same price offered to Maryland wholesalers, unless a particular brand is withdrawn from sale in the United States.

The consenting manufacturers are permitted to establish exclusive distributorships, to lobby for legislation, to take action required by federal, state or local legislation or regulations, and to engage in fair trade unless and until a final

decree (not subject to further appeal) requiring a suspension of fair trade is entered herein against Seagram and Schenley defendants, in which event the consenting defendants will be required to suspend their fair trade activities for a limited period. The consent decree concludes with provisions for supervision of defendants' activities under the direction of the Assistant Attorney General in charge of the Antitrust Division, in order to secure compliance with its provisions.

The Seagram defendants agree that the decree to be entered against them should contain provisions similar to those in the consent decrees against the other defendant manufacturers, including a provision requiring them to sell to Montgomery County at the prices charged to wholesalers in Maryland the following brands manufactured by subsidiaries of Jos. Seagram and distributed by various divisions of Seagram: Lord Calvert Whiskey, Calvert Reserve Whiskey, Carstairs White Seal Whiskey, London Distilled Gin, Four Roses Whiskey, Hunter Whiskey, Paul Jones Whiskey, Four Roses Gin, and Gallagher & Burton Black Label Whiskey. The government agrees that the last provision shall not be made to apply to Seagram's V.O., 7-Crown and Golden Gin because those brands were never offered to Montgomery County at any price less than the price charged to retailers.

The Schenley defendants argue that if there is a decree against them it should contain general provisions similar to those in the consent decree, but without any specific requirement with respect to sales to Montgomery County, and that any provision requiring them to sell to Montgomery County at the prices charged to wholesalers should be limited to the following brands manufactured by Schenley or its subsidiaries: Old Quaker Straight Bourbon Whiskey, Old Stagg Straight Kentucky Bourbon Whiskey, Ancient Age Straight Kentucky Bourbon Whiskey, Cascade Straight Kentucky Bourbon Whiskey, Echo Springs Straight Kentucky Bourbon Whiskey, Old Charter Straight Kentucky Bourbon Whiskey, Cream of Kentucky Blended Whiskey, I. W. Harper Kentucky Bourbon Whiskey (bottled in bond), Melrose Rare Blended Whiskey, James E. Pepper Kentucky Bourbon Whiskey (bottled in bond), Gibson Diamond-8 Blended Whiskey (discontinued brand), Golden Wedding Blended Whiskey, Three Feathers Blended Whiskey, Coronet Brandy, Dewar's White Label Scotch, Melrose Gin, Dubonnet Apertif, Roma Wines.

Schenley argues, moreover, that since its "A blend", Schenley Reserve and its Canadian whiskies are in direct competition with the Seagram "A blend", 7-Crown and Seagram's V.O., it would be unfair to impose on Schenley and Affiliated any requirement with respect to the sale of Schenley Reserve and its Canadian whiskies which is not imposed on Seagram with respect to the sale of 7-Crown and V.O. The evidence shows that 7-Crown and V.O. were never sold to Montgomery County at a reduced price, but that Schenley Reserve and McNaughton were so sold until the boycott forced Affiliated to change its policy. However, since the evidence further shows that Seagram was a more eager adherent to the conspiracy than Schenley, and used its refusal to sell 7-Crown and V.O. to Montgomery County at a low price as a means of promoting the sale of 7-Crown and V.O. to the conspiring retailers, I have concluded that Schenley should be allowed the same freedom with respect to pricing Schenley Reserve and its Canadian whiskies that Seagram is allowed with respect to 7-Crown and V.O. The provision requiring sale to Montgomery County at the low price will therefore not be applied to Schenley Reserve and its Canadian whiskies.

The requirement of sale to Montgomery County will be limited to those Seagram and Schenley brands listed above. In the event that sale of any such brand is discontinued in the State of Maryland, the requirement of sale to Montgomery County will be suspended until resumption of sale thereof in the State of Maryland.

A sale by a wholesale distributor to Montgomery County at the cost to the wholesaler plus handling charges not to exceed $1 per case shall be considered equivalent to a sale by a manufacturer direct to Montgomery County at the prescribed price. This provision shall apply to all defendants herein.

We come, finally, to the most bitterly contested point in the case. The government seeks a decree against the Seagram and Schenley defendants providing that each of them:

(A) Be required within thirty days after the entry of final judgment herein, (1) to cancel all fair trade contracts for the State of Maryland to which it is a party and which fix or control the resale price of alcoholic beverages, and (2) to give to all its Maryland customers and Maryland licensed retailers handling its products notice of such cancellation and termination, informing them that each retailer shall individually determine his resale price for such products without reference to fair trade prices theretofore established thereon;

(B) Be restrained for a period of two years from entering into or adhering to any fair trade contract in the State of Maryland;

(C) Be restrained for a period of two years from disseminating or preparing for dissemination to any person in the State of Maryland price lists or other price information containing minimum or suggested resale prices, markups, margins of profit, terms or conditions at which such alcoholic beverages are to be resold or offered for sale, except as provided by Article 2B, section 109 of the Annotated Code of Maryland;

(D) Be restrained for a period of two years from shopping, policing, reporting or otherwise enforcing, minimum or suggested retail prices, markups, margins of profit, terms or conditions at which such alcoholic beverages are to be sold or offered for sale in the State of Maryland.

Because of the provisions in the consent decrees such a suspension of fair trade would become binding on all other defendants in this case.

The government contends that only by means of such a suspension of fair trade can the effects of the conspiracy be dissipated. On the other hand, the Seagram and Schenley defendants contend that the provisions in the consent decrees, properly enforced, will be sufficient to prevent a recurrence of or a continuance of the conspiracy, and that a suspension of fair trade would be (1) unfair to them and (2) contrary to the express purpose of the Maryland alcoholic beverage law.[7]

The evidence shows that even after the filing of the indictment against the defendants herein and others, the filing of the complaint in this case, and the imposition of fines upon the defendants on their pleas of nolo contendere in the criminal case, individual retailers, who were not made defendants in either case, have continued their pressure on the manufacturers to induce them not to sell to Montgomery County directly or indirectly at any price less than the prices at which their products are sold to retailers.

The conspiracy to which all of the defendants adhered existed for so long a time, was so widespread, and is still so animate among the retailers, that in the ordinary case this court would hold that a suspension of all fair trade activity by defendant manufacturers would be neces-

---

7. Counsel for Seagram have submitted a detailed code of what must be done and what must not be done by defendant manufacturers in establishing and enforcing fair trade, and suggest that it be included in the decree. I am satisfied that the proposal was made in good faith, but there is always the danger that someone will claim *expressio unius* *est exclusio alterius.* The proposed code lists a number of deadly offenses against the antitrust laws, and some that are venial, but it does not cover all the activities which are likely to be engaged in by one who covets his neighbor's customer, or is tempted to the sin of avarice. I have reluctantly concluded that it should be omitted.

sary to prevent a continuance or revival of the conspiracy. But this is not the ordinary case. It involves the liquor business, with its peculiar problems, which have been recognized by the Supreme Court of the United States and by the Court of Appeals of Maryland. United States v. Frankfort Distilleries, Inc., 324 U.S. 293, 65 S.Ct. 661, 89 L.Ed. 951; Dundalk Liquor Co. v. Tawes, 201 Md. 58, 92 A.2d 560.

■ The alcoholic beverage law of the State of Maryland, Ann.Code, 1957 ed., Art. 2B, sec. 1, declares that it is necessary to regulate and control the liquor traffic "to obtain respect and obedience to law and to foster and promote temperance". Sec. 109(a), adopted in 1951 as part of an act to authorize certain regulations of the Comptroller which had been held invalid under the previous law, states:

"(a) *Declared policy of State— Elimination of price wars.*—It is the declared policy of this State that it is necessary to regulate and control the sale and distribution within the State of wines and liquors, for the purpose of fostering and promoting temperance in their consumption and respect for and obedience to the law. In order to eliminate price wars, which unduly stimulate the sale and consumption of wines and liquors and disrupt the orderly sale and distribution thereof, it is hereby declared as the policy of this State that the sale of wines and liquors should be subjected to the following restrictions, prohibitions and regulations. The necessity for the enactment of the provisions of this section is, therefore, declared as a matter of legislative determination."

■ A federal court dealing with problems arising out of the liquor traffic in Maryland cannot properly ignore these provisions. True, this court and the Fourth Circuit have held that the Twenty-first Amendment and the Maryland statute do not afford an excuse for the violations of the antitrust laws which have been committed by defendants. Nevertheless, this court should consider the expressed policy of the State of Maryland in determining what relief should be granted in this case. This court must weigh the difficulties of enforcing its decree without a provision suspending fair trade against the probability that such a provision would encourage price cutting and price wars, to which the State of Maryland has expressly declared its opposition. A proper respect for the policy of the State requires this court not to include such a provision in the decree until it has been shown that such a provision is necessary to enforce obedience to the federal law.

This court cannot cure all of the problems presented by the fact that Montgomery County claims the power under Maryland law to buy as a wholesaler and sell as a retailer.

I will, therefore, include in the decree against the Seagram and the Schenley companies the provision for the suspension of fair trade requested by the government, but will suspend its operation against all defendants unless and until it is made clear to the court that the other provisions of the decree are insufficient to prevent the continuance or recurrence of the conspiracy. The government may move at any time more than six months and less than three years after the date of this decree for an order removing the suspension of the operation of that provision, making that provision binding on all of the defendants in this case for a period of two years from the date of such order.

Any of the defendants may move to modify this decree with respect to Montgomery County and individual action, at any time, because of a change in Maryland law or upon a showing of hardship.

Counsel will prepare appropriate decrees.